FILED by _GMC_ D.C.
INTAKE

OCT 0 5 2009

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. MIAMI

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

MEDMARC CASUALTY INSURANCE
COMPANY,

            Plaintiffs,                     CASE NO: **09-61585**

vs.

GABRIELLE ALEXIS, and GABRIELLE
ALEXIS, P.A.                                        CIV-ZLOCH

            Defendant.
_____                         /ROSENBAUM

### COMPLAINT FOR RESCISSION

Medmarc Casualty Insurance Company ("Medmarc") sues Gabrielle Alexis ("Alexis")

and Gabrielle Alexis, P.A. ("Alexis P.A.") for rescission as follows:

### NATURE OF ACTION

1.      This is an action seeking rescission of a Lawyers Professional Liability insurance

contract.

### JURISDICTION AND VENUE

2.      This Court has jurisdiction pursuant to 28 U.S.C. 1332.

3.      The amount in controversy exceeds the sum of Seventy-Five Thousand Dollars

($75,000), exclusive of interest and costs.

4.      Venue is proper in the Southern District of Florida since the subject insurance

policy incepted in this district.

5.      All conditions precedent to instituting this action have occurred, been performed,

or have been waived.

### THE PARTIES

6.      The Plaintiff, Medmarc, is a foreign corporation, incorporated under the laws of

Vermont, with its principal place of business in Fairfax County, Virginia.

14458902v1  899876  53471

7.    The Defendant, Alexis, was at all material times a citizen of the State of Florida, residing in Broward County, Florida.

8.    The Defendant, Alexis P.A., was at all material times a professional association with its principal place of business in Broward County, Florida.

## COMMON ALLEGATIONS

9.    Alexis was at all material times an attorney and Director of Alexis P.A.

10.    In order to obtain insurance coverage for the firm, Alexis completed an application for Lawyers Professional Liability insurance.    A copy of her application and supplemental application is attached as Exhibit A.

11.    The application submitted for coverage contained the following statements:

By signing this application on the following page, the applicant agrees that after inquiry of all prospective insureds, no person proposed for coverage is aware of any act or circumstance which reasonably might give rise to a future claim that would fall within the scope of the proposed coverage. . . .    It is agreed by the applicant and the insurer that the particulars and statements made in this application, together with all attachments to this application and any other material submitted to the insurer (all of which attachments and materials shall be deemed attached to the policy as physically attached thereto) shall be the representations of the applicant and prospective insured.    It is further agreed by the applicant and the prospective insureds that this policy, if issued, is issued in reliance upon the truth of such representations that are incorporated into and made part of the policy.    After inquiry of all prospective insureds, the undersigned authorized officer of the applicant represents that the statements set forth in the application and its attachments and other materials submitted to us are true and correct. . . .    The undersigned further declares that any event taking place between the date this application was signed and the effective date of the insurance applied for which may render inaccurate, untrue, or incomplete any information in this application, will immediately be reported in writing to us and we may withdraw or modify any outstanding quotations and/or authorization or agreement to bind the insurance.

12.    Since the application was initially submitted on a Zurich form, Alexis also signed a Medmarc Florida Acceptance And No Known Loss Statement.    That form contained the following language:

2

The statement and information set forth in the application are true, complete and accurate as of the date noted below. I/We acknowledge and agree that the "Company" referred to in the application shall be Medmarc Casualty Insurance Company. The representations, duties and obligations of all parties remain unaffected.

13.    The application was submitted to Medmarc.

14.    The policy contains the following provision:

**SECTION VI: CONDITIONS**

. . .

K.    <u>**Application**</u>

By acceptance of this Policy, the **"Insureds"** agree that: 1) the statements in the application and in all additional material submitted by any **"Insured"** for this Policy or for any prior Policies issued by this Company, which are made a part of this Policy, are personal representations, that they shall be deemed material and that this Policy is issued in reliance upon the truth of such representations; 2) this Policy embodies all agreements existing between the **"Insureds"** and the Company, or any of its agents, relating to this insurance; and 3) the **"Insureds"** have a continuing obligation to report any changes to its answers to the application questions, or in information contained in any additional submissions, including, but not limited to, any **"Claims"**, potential claims, and any changes in its areas of practice, outside ownership interests, and the number of attorneys who are partners, principals, or employees of the "Named Insured".

15.    In reliance on the information contained in the application, Medmarc issued a policy to the law offices of Gabrielle Alexis, P.A., Policy No. 08APFL02716 with limits of liability of $500,000 each claim and $1,000,000 in the aggregate. A copy of the insurance policy is attached as Exhibit B.

16.    After the policy was issued, Alexis and Alexis P.A. were sued by Jonathan E. Pearlman, Esq., as court-appointed Receiver of Creative Capital Consortium, LLC arising out of her representation of Creative Capital, Dolce Regency and George Theodule. A copy of the Pearlman Amended Complaint is attached as Exhibit C.

14458902v1 899876 53471

17.     On May 14, 2009, Alexis tendered the Pearlman lawsuit to Medmarc for a defense. A copy of Alexis's letter is attached as Exhibit D.

18.     Pursuant to the terms and conditions of the Medmarc policy, Medmarc scheduled the examination under oath of Alexis.

19.     The examination under oath of Alexis took place over several days. However, the examination under oath was never fully completed since Alexis refused to produce certain documents or answer questions, instead invoking her Fifth Amendment right against self-incrimination.

20.     Based upon Alexis's answers at her examination under oath, Medmarc was able to establish that her insurance application contained the following misrepresentations:

      a.     she incorrectly reported her areas of practice;

      b.     she answered the question "does the applicant have any one client that represents 10% or more of the applicant's billings," no, when in fact, the answer was yes since Creative Capital represented far more than 10% of the applicant's billings;

      c.     she answered the question "does she have formal written procedures regarding maintenance and review of custodial accounts and escrow records," yes, when in fact, she did not;

      d.     while she answered the question, yes, that during the past 10 years she had been the subject of a criminal action, reprimand, disciplinary action, bar complaint, investigation or other ethics proceeding, she only attached two complaints when there was, in fact, a third complaint that was not reported to Medmarc;

      e.     she also answered, no to the question of whether she was aware of any circumstances, incident, act, error or omission that could result in a claim or suit against the applicant or any predecessor or any of the formal or current attorneys or employees of

the applicant, when in fact, Alexis knew prior to the application that she allowed one client (Theodule ) to divert money belonging to another client (Dolce Regency) from her trust account and then stood by while Theodule lost that money in speculative stock trades.

21.     Medmarc initially offered to defend Alexis and Alexis P.A. subject to a reservation of rights.  On September 30, 2009, Medmarc advised Alexis and Alexis P.A. that it is withdrawing from the defense and will not indemnify them as a result of the Pearlman suit.

**COUNT I – NO COVERAGE BASED UPON
STATUTORY RESCISSION**

22.     Medmarc realleges paragraphs 1 through 21 as paragraph 22 of Count I.

23.     Alexis's and Alexis P.A.'s misrepresentations in the application were material to Medmarc's decision to enter into the insurance contract with the firm.

24.     If Alexis and Alexis P.A. had accurately completed the application and Medmarc had known the truth, Medmarc would not have entered into the insurance contract, would have entered into the contract at a higher premium, or would have entered into the contract under different terms.

25.     Accordingly, pursuant to Florida Statute 627.409, Medmarc is entitled to rescind the policy.

26.     In view of the foregoing, this Court has the power to declare the rights and liabilities of the parties pursuant to 28 U.S.C. 2201.

Wherefore, Medmarc respectfully requests this Court to:

a.     take jurisdiction of this matter and determine and adjudicate the rights of the parties with respect to the Medmarc policy;

b.     find and declare that Medmarc has no duty to defend or indemnify Alexis or Alexis P.A. as a result of the Pearlman suit;

5

c.    find and declare that the Medmarc policy is void; and

d.    grant Medmarc the cost of this action and any such other further relief as this Court deems equitable, just and proper under the evidence and circumstances.

## COUNT II – RESCISSION BASED UPON THE TERMS OF THE POLICY/APPLICATION

27.    Medmarc realleges paragraphs 1 through 21 as paragraph 27 of Count II.

28.    Both the application and policy provide that the representations made in the application shall be deemed material and that the policy was issued in reliance upon the truth of such representations.

29.    The Medmarc policy does not afford coverage as a result of Alexis and Alexis P.A.'s breach of the policy's application provisions as well as based upon the language of the application and known loss affidavit.

30.    The Medmarc policy does not afford coverage as a result of Alexis and Alexis P.A.'s misrepresentations in the application for insurance, including, but not limited to:

a.    she incorrectly reported her areas of practice;

b.    she answered the question "does the applicant have any one client that represents 10% or more of the applicant's billings," no, when in fact, the answer was yes since Creative Capital represented far more than 10% of the applicant's billings;

c.    she answered the question "does she have formal written procedures regarding maintenance and review of custodial accounts and escrow records," yes, when in fact, she did not;

d.    while she answered the question, yes, that during the past 10 years she had been the subject of a criminal action, reprimand, disciplinary action, bar complaint, investigation or other ethics proceeding, she only attached two complaints when there was, in fact, a third complaint that was not reported to Medmarc;

6

14458902v1 899876 53471

e.      she also answered, no to the question of whether she was aware of any circumstances, incident, act, error or omission that could result in a claim or suit against the applicant or any predecessor or any of the formal or current attorneys or employees of the applicant, when in fact, Alexis knew prior to the application that she allowed one client (Theodule ) to divert money belonging to another client (Dolce Regency) from her trust account and then stood by while Theodule lost that money in speculative stock trades.

31.    In view of the foregoing, an actual controversy exists between the parties, and by the terms and provisions of 28 U.S.C. 2201, this Court has the power to declare the rights and liabilities of the parties and to give such other relief as may be necessary.

Wherefore, Medmarc respectfully requests this Court to:

a.      take jurisdiction of this matter and determine and adjudicate the rights of the parties with respect to the Medmarc policy;

b.      find and declare that Medmarc has no duty to defend or indemnify Alexis or Alexis P.A. as a result of the Pearlman suit;

c.      find and declare that the Medmarc policy is void; and

d.      grant Medmarc the cost of this action and any such other relief as this Court deems equitable, just and proper under the evidence and circumstances.

**COUNT III – NO COVERAGE BASED UPON**
**THE FAILURE TO PROVIDE DOCUMENTATION**
**AND/OR ANSWER QUESTIONS AT THE**
**INSURED'S EXAMINATION UNDER OATH**

32.    Medmarc realleges paragraphs 1 through 21 as paragraph 32 of Count III.

33.    The Medmarc policy contains the following provision:

**SECTION VI: CONDITIONS**

. . .

14458902v1 899876 53471

### G.    Assistance and Cooperation of the "Insured"

All **"Insureds"** shall cooperate with the Company's investigation of coverage under this policy and/or the defense of **"Claims"**.  All **"Insureds"** shall, upon the Company's request, submit all documents requested by the Company and submit to an examination and interrogation by a representative of the Company, under oath, if required, and shall attend hearings, depositions and trials and shall assist in effecting settlement, securing and giving evidence, obtaining the attendance of witnesses, and in the conduct of suits, as well as in the giving of a written statement or statements to the Company's representatives and meeting with such representatives, all without charge to the Company, except as otherwise provided in SECTION III., C. Loss of Earnings Allowance. The **"Insured"** shall further do whatever is necessary to preserve, secure and effect any rights of indemnity, contribution, subrogation or apportionment which the **"Insured"** may have against others and cooperate with the Company as to pursuing those rights.  The **"Insured"** shall not exercise the **"Insured's"** right to either reject or demand the arbitration of any **"Claim"** made against the **"Insured"** except in accordance with the written instructions of the Company. The **"Insured"** shall not, except at the **"Insured's"** own cost, make payment, admit any liability, settle any **"Claims"**, assume any obligation or incur any expense without the written consent of the Company.

34.    At the insured's examination under oath, she refused to produce certain documents, including, but not limited to, tax returns and bank records.

35.    In addition, at the insured's examination under oath, she refused to answer certain questions, including but not limited to, whether she complied with the firm's escrow practices and to disclose all of the bank and trust accounts maintained by the firm and/or Alexis, individually.

36.    The insured's refusal to produce records and/or answer questions relieves Medmarc of any responsibility to defend and indemnify Alexis and Alexis P.A.

37.    In view of the foregoing, an actual controversy exists between the parties and by the terms and provisions of 28 U.S.C. 2201, this Court has the power to declare the rights and liabilities of the parties and to give such other relief as may be necessary.

Wherefore, Medmarc Casualty Insurance Company requests this Court to:

14458902v1  899876  53471

   a.      take jurisdiction of this matter and determine and adjudicate the rights and liabilities of the parties with respect to the Medmarc policy;

   b.      find and declare that Medmarc has neither a duty to defend nor duty to indemnify Alexis or Alexis P.A. for the Pearlman suit; and

   c.      grant Medmarc such other relief as the Court deems fit and proper under the evidence and circumstances.

Dated: October 5th, 2009.

Respectfully submitted,

HINSHAW AND CULBERTSON LLP

Ronald L. Kammer, Esq.
Florida Bar No. 360589
rkammer@hinshawlaw.com
9155 South Dadeland Boulevard
Suite 1600
Miami, Florida 33156
Telephone: 305-358-7747
Facsimile: 305-577-1063

14458902v1 899876 53471

11/14/08

Fri Oct 17 15:08:59 2008   From: Hart,Melanie   To: B156137589 Page 3 of 14

# Lawyers Professional Liability Insurance Application


**ZURICH**

### AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY

**THIS APPLICATION IS FOR A CLAIMS-MADE AND REPORTED POLICY.**
**IF ISSUED, PLEASE READ YOUR POLICY CAREFULLY.**

Please type or print clearly in ink. Answer all questions. If space is insufficient to answer any question fully, attach a separate sheet. Complete all required supplements.

**GENERAL INFORMATION**
Applicant's (Firm) Name: Law Offices of Gabriella Alexis, P.A.
Street Address: 1325 Congress Avenue, Ste 100
(P.O. Box not acceptable)
City: Boynton Beach    State: FL    Zip Code: 33426
Phone: (561) 375-8866    Fax: (561) 375-8990
Applicant's Contact E-Mail: alexislaw@Bellsouth.net    Website Address: _____

Please attach a list of all branch and secondary locations and a copy of the Applicants letterhead.

Form of Business: [X] Sole Practitioner  [ ] Partnership  [ ] Professional Assoc.
[ ] Limited Liability Partnership/Corp  [ ] Professional Corporation  [ ] Corporation

**DESIRED COVERAGE**
| | |
|---|---|
| [ ] $100,000/$300,000 | [ ] $2M/$2M |
| [ ] $200,000/$600,000 | [ ] $3M/$3M |
| [X] $500,000/$600,000 | [ ] $4M/$4M |
| [ ] $1M/$1M | [ ] $5M/$5M |
| [ ] Other: | |

**DESIRED DEDUCTIBLE**
| | |
|---|---|
| [ ] $0 | [ ] $15,000 |
| [ ] $1,000 | [ ] $20,000 |
| [ ] $5,000 | [ ] $25,000 |
| [ ] $10,000 | |
| [ ] Other: | 2,500 |

**ATTORNEY/FIRM INFORMATION**
1.  Total Number of Attorneys: 1
2.  Please list all Attorneys working for Applicant (include yourself if you are a sole practitioner). In the chart below. If necessary, please continue on a separate sheet.

| Attorney Name | D.C. * | Social Security Number | Date of Birth (mm/dd/yy) | Years in Practice | Date of Hire (mm/dd/yy) | # of Hours Worked/ Week | Attorney Bar # |
|---|---|---|---|---|---|---|---|
| Gabriella Alexis | S | | 07/23/69 | .12 | 5-3-08 | 60 | 79352 |

*Designation Codes
O - Officers, Directors, Shareholders of the corporation who are licensed attorneys
P - Partner, if a Partnership
C - Of Counsel Attorney
PT - Part-Time Attorney (must practice law fewer than twenty-six (26) hours per week solely for applicant firm)
S - Sole Practitioner
E - Employed Attorney
IC - Independent Contractor

3.  Have all of the Attorneys listed in Question 2 taken Continuing Legal Education (CLE) course(s) in the past twelve (12) months?    [X] Yes  [ ] No

4.  If the Applicant is a sole practitioner, who is the Attorney that will handle the Applicants cases in the Applicants absence?
Name: Carol Grant, Esq.    Does he/she maintain professional liability coverage?  [X] Yes  [ ] No
Address: PCG x641354    City/State/Zip: Pembroke Pines, FL 38084

5.  Does the Applicant share an office or suite with attorneys other than those listed in Question 2 above?  [ ] Yes  [X] No
    If yes, does the Applicant share staff or letter head?  [ ] Yes  [X] No

6.  What date was the Applicant established?    (mm/dd/yyyy) 03/07/2008

U-PL-888-C CW (01/07)
Page 1 of 6

EXHIBIT

A

ALL-STATE LEGAL

No. 3646  P. 2                                                          Nov. 11. 2008  4:59PM

11/14/08

Fri Oct 17 15:08:59 2008  From: Hart,Melania  To: 9156137589 Page 4 of 14

*Prior Policy LPL 8968530 expired 10/8/08*

## ATTORNEY/FIRM INFORMATION cont'd...

**7.** How many non-Attorney employees does the Applicant have? — `2`

**8.** Provide the date that the Applicant has been continuously insured for lawyers professional liability claims: (mm/dd/yyyy) — `GAP`

**9.** Does the Applicant's current professional liability policy contain a limitation on prior acts coverage (i.e., retroactive date, prior acts exclusion, etc.)? — ☑ Yes ☐ No
If Yes, please provide the date: (mm/dd/yyyy) — `GAP`

**10.** Does any Attorney in Question 2 above have a limitation on prior acts coverage (i.e., retroactive date, prior acts exclusion, etc.) that is different from that of the Applicant? — ☐ Yes ☑ No
If YES, please list the name of the Attorney(s) and the prior acts exclusion date on a separate sheet.

**11.** Is any Attorney in Question 2 above not currently covered by lawyers professional liability insurance? — ☐ Yes ☑ No
If YES, please list the name of the Attorney(s) and the reason he/she is not covered by insurance on a separate sheet.

**12.** List the Applicant's lawyers' professional liability insurance information for the past five (5) years below.

| Policy Period | Limit of Liability | Deductible | Insurer | Premium |
|---|---|---|---|---|
| 10/07 – 10/08 | 500,000/1,000,000 | 2,500 | Zurich | |
| " 06 – 07 | " | " | " | 9,664 |
| 05 – 06 | " | " | " | 14,419 |
| 04 – 05 | " | " | " | 9409 |

**13.** Has any Attorney in Question 2 above had his/her lawyers professional liability insurance declined, canceled, non-renewed or reduced by any professional liability insurer during the past five (5) years? (question not applicable in the State of Missouri) — ☐ Yes ☑ No
If YES, please provide the name of the Attorney and explanation on a separate sheet.

## AREAS OF PRACTICE

**14.** Instructions for completing this section
   a. Based upon the last fiscal year, please provide the percentage of time devoted (number of hours actually worked) to each area of practice listed in the chart below.
   b. If the Applicant notes work for any areas of practice in CAPS, please complete the applicable supplemental application forms included with the application.
   c. Does the Applicant's practice involve any Attorney acting in the capacity of a mediator or arbitrator? — ☐ Yes ☑ No
   If YES, indicate the percentage of time devoted to acting as a mediator or arbitrator ____%

| Area of Practice | % | Area of Practice | % |
|---|---|---|---|
| Admiralty/Maritime | % | Government (Federal/State/Local/Lobbying) | % |
| Antitrust/Trade Regulation | % | Healthcare | % |
| Aviation | % | Immigration | 5 % |
| Bankruptcy | 5 % | Insurance Defense Litigation | % |
| Business Transactions / Commercial Law | 3 % | Insurance Other (Coverage, Regulatory, Subrogation) | % |
| Civil Rights | % | International Law | % |
| Collections | % | Investment Counseling/ Money Management | % |
| Commercial Practice – Business Litigation | % | Labor – Union Related Work | % |
| Communications / Media | % | Medical Malpractice – Defendant | % |
| Construction Law | % | Medical Malpractice – Plaintiff | 2 % |
| Consumer Claims | % | Oil / Gas | % |
| COPYRIGHT/TRADEMARK | % | PATENT | % |
| Corporate – Business Formation/Alteration | 1 % | Personal Injury – Defendant | % |
| Corporate – Business Transactions/Advice | % | Personal Injury – Plaintiff | 20 % |
| Criminal Law | % | Public Utilities | % |
| Disability / Social Security | % | Real Estate – Commercial | % |
| Elder Law | % | Real Estate – Residential | 49 % |
| Employment | % | SECURITIES LAW (except corporate formation) | % |
| ENTERTAINMENT | % | Secured Transaction (UCC – Commercial Paper) | % |
| ENVIRONMENTAL | % | Taxation | % |
| Estates / Wills / Trust / Probate | % | Tax Shelters | % |
| Family Law | 15 % | Workers' Compensation – Defendant | % |
| Financial Institutions–Reg. Compliance | % | Workers' Compensation – Plaintiff | % |
| | | TOTAL (must equal 100%) | % |

U-PL-366-C CW (01/07)
Page 2 of 9

11/14/08

**AREAS OF PRACTICE cont'd...**

15. If the Applicant has stated any percentage of Medical Malpractice - Plaintiff work in the area of practice chart above, please indicate in percentages the amount of work allocated to the following areas:

| Nursing Homes | % | OB/GYN | % | Oncology | % | Pediatrics | % |
|---|---|---|---|---|---|---|---|
| Permanent Disability | % | Wrongful Death | % | Other* | % | | |

*If the Applicant stated a percentage of work for "Other," please explain the type of work performed on a separate sheet.

16. Does the Applicant engage in any Class Action / Mass Tort work?  ☐ Yes ☑ No
If YES, please complete the applicable Supplemental Application.

17. Does the Applicant expect any changes to its areas of practice in the next twelve (12) months?  ☐ Yes ☑ No
If YES, please explain on a separate sheet and specifically indicate the new areas of practice to be handled by the Applicant.

**DOCKET/CALENDAR CONTROL**

18. a. Does the Applicant's docket/calendar control system include the following? (Please check all that apply)
☐ Single Calendar  ☑ Dual Calendar  ☐ Tickler Cards  ☑ Master Listing  ☑ Computer  ☐ Other (please describe):

b. Indicate how frequently the time deadlines are cross-checked: ☑ Daily ☐ Weekly ☐ Monthly ☐ Never

**RISK MANAGEMENT**

19. Does the Applicant require the use of engagement letters including fee agreements on all new matters undertaken by the firm?  ☑ Yes ☐ No

20. Does the Applicant issue declination letters or non-engagement letters for all matters it declines?  ☑ Yes ☐ No

21. Does the Applicant outline and reduce to writing its billing policy and procedures when agreeing to represent a new client?  ☑ Yes ☐ No

22. Does the Applicant have a procedure for evaluating prospective clients, including such factors as the prospective clients' financial strength, management expertise, reputation or history of changing attorneys?  ☑ Yes ☐ No

23. Does the Applicant reduce to writing the scope of its services when taking on new matters for existing clients?  ☑ Yes ☐ No

24. Does the Applicant have formal written procedures regarding the maintenance and review of custodial accounts and escrow funds?  ☑ Yes ☐ No

25. Does the Applicant have a computer back-up system or some other form of emergency back-up system in the event of a disruption or interruption of business?  ☑ Yes ☐ No

26. Does any Attorney in Question 2 above have any law partners, associates, of counsel or employed attorneys other than those listed in Question 2 above or is any Attorney listed in Question 2 above employed by or perform legal work for an entity other than the Applicant? If YES, please explain on a separate sheet.  ☐ Yes ☑ No

27. Does the Applicant or any Attorney in Question 2 above, firm serve as a director, officer, employee, or other management capacity for a past or present client? If YES, please explain on a separate sheet.  ☐ Yes ☑ No

28. Does the Applicant or any past or present Attorney of the Applicant own an equity interest in any past or current client of the Applicant? If YES, please complete the Controlling Interests Supplemental Form.  ☐ Yes ☑ No

29. Do twenty-five percent (25%) or more of the Applicant's revenues come from any form of fee sharing, sub-contracting or referral work? If YES, please explain on a separate sheet.  ☐ Yes ☑ No

30. Does the Applicant have any one client that represents ten percent (10%) or more of the Applicant's billings? If YES, please explain and specify the area of practice and type of work performed for that client on a separate sheet. Provide client name and/or nature of business entity  ☐ Yes ☑ No

31. Does the Applicant have procedures for identifying and resolving potential or actual conflicts of interest, including cross checking of former, existing or potential clients?  ☑ Yes ☐ No
If YES, is the procedure computerized?  ☐ Yes ☑ No

32. Has the Applicant initiated lawsuits or arbitration procedures during the past five (5) years to enforce collection of unpaid fees for the Applicant?  ☐ Yes ☑ No
a. If YES, how many matters?
b. How many of these matters have been resolved successfully?
c. How many of these matters are still unresolved?

MAY-19-2009 09:48 From:

11/14/08

Fri Oct 17 15:08:59 2008    From: Hart,Melanie    To: 9156137589Page 6 of 14

---

**LOSS HISTORY**
If the answer is *YES* to any of the following questions, complete the Notice of Circumstance /Claim Reporting Form included with the application and attach additional sheets as necessary.

33.  During the past ten (10) years has any Attorney in Question 2 above or employee of the Applicant been the subject of a criminal action, reprimand, disciplinary action, bar complaint, investigation, or other ethics proceeding?   *2 bar complaints were dismissed - see attached*   ☑ Yes  ☐ No

34.  During the past five (5) years has any claim or suit arising out of the rendition of legal services been made against any Attorney in Question 2 above or employee of the Applicant?   ☐ Yes  ☑ No

35.  Is any Attorney in Question 2 above or employee of the Applicant aware of any circumstance, incident, act, error or omission that could result in a claim or suit against the applicant or any predecessor or any of the former or current Attorneys or employees of the Applicant?   ☐ Yes  ☑ No

---

**IT IS AGREED THAT IF THE RESPONSE TO QUESTIONS 33, 34 AND 35 ARE IN THE AFFIRMATIVE, ANY CLAIM OR CIRCUMSTANCE THAT COULD RESULT IN A CLAIM WILL BE EXCLUDED FROM THE PROPOSED COVERAGE.**

There are many factors used by the Company to evaluate an Application for Lawyers Professional Liability Insurance. Such factors may include a law firm's areas of practice, loss history, risk management and an insurance score.

An insurance score is developed from a mathematical model that weighs and measures credit information such as payment history, the number of collections, bankruptcies, outstanding debt, length of credit history, types of credit in use and the number of new applications for credit. These factors have been shown to correlate with insurance loss activity.

You may be eligible for a premium discount based upon your insurance score. An insurance score will not result in a premium increase. The insurance score is also never the basis on which the company will accept or reject an application for an insurance policy.

If you do not wish to have your insurance score computed, please check the box. ☐

By signing this application on the following page the applicant agrees that after inquiry of all prospective insureds, no person proposed for coverage is aware of any fact or circumstance which reasonably might give rise to a future claim that would fall within the scope of the proposed coverage.

Receipt and review of this application does not bind the insurer to provide this insurance.

It is agreed by the applicant and the insurer that the particulars and statements made in this application, together with all attachments to this application and any other materials submitted to the insurer (all of which attachments and materials shall be deemed attached to the policy as if physically attached thereto) shall be the representations of the applicant and the prospective insureds. It is further agreed by the applicant and the prospective insureds that this policy, if issued, is issued in reliance upon the truth of such representations that are incorporated into and made part of this policy. After inquiry of all prospective insureds, the undersigned authorized officer of the applicant represents that the statements set forth in this application and its attachments and other materials submitted to us are true and correct. Signing of this application does not bind the applicant or the insurer.

The undersigned further declares that any event taking place between the date this application was signed and the effective date of the insurance applied for which may render inaccurate, untrue, or incomplete any information in this application, will immediately be reported in writing to us and we may withdraw or modify any outstanding quotations and/or authorization or agreement to bind the insurance.

The applicant represents that the above statements are true and correct to the best of his or her knowledge and that no material or relevant facts have been suppressed or misstated and agree that the policy, if issued, will be issued on the reliance of such representations.

Notice to Nebraska Applicant: No misrepresentations or warranty made by the insured or on his behalf in the negotiation or application of this policy or contract of insurance shall defeat or void the policy or contract or effect the company's obligation under the policy or contract unless such misrepresentation or warranty was material, was made knowingly with the intent to deceive, was relied and acted upon by the company and deceived the company to its injury. The breach of a warranty or condition in any contract or policy of insurance shall not void the policy or allow the company to avoid liability unless such breach exists at the time of the loss and contributes to the loss.

**Required State Fraud Notices**

Notice to Arkansas Applicant: Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

Notice to Colorado Applicant: It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance, and civil damages. Any insurance company or agent of an insurance who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the department of regulatory agencies.

11/14/08

**Notice to District of Columbia Applicant:** It is a crime to provide false or misleading information to an insurer for the purpose of defrauding the insurer or any other person. Penalties include imprisonment and/or fine. In addition, an insurer may deny insurance benefits if false information related to a claim was provided by the applicant.

**Notice to Florida Applicant:** Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree.

**Notice to Kentucky Applicant:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime.

**Notice to Louisiana Applicant:** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**Notice to Maine Applicant:** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines or a denial of insurance benefits.

**Notice to New Jersey Applicant:** Any person who includes any false or misleading information on an application for an insurance policy is subject to criminal and civil penalties.

**Notice to New Mexico Applicant:** ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO CIVIL AND CRIMINAL PENALTIES.

**Notice of Ohio Applicant:** Any person who, with intent to defraud or knowingly that he/she is facilitating a fraud against any insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud.

**Notice to Oklahoma Applicant: WARNING:** Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

**Notice to Pennsylvania Applicant:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

**Notice to Vermont Applicant:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any false information or conceals for the purpose of misleading, information concerning any fact material thereto, may have committed a fraudulent insurance act.

Completion of this form does not bind coverage. Applicant's acceptance of company's quotation is required prior to binding coverage and policy issuance. It is agreed that this application shall be the basis of the contract of insurance should a policy be issued and it will be attached to the policy.

Signature: _Gabrielle Alexis_    Date: _10-11-08_
Principal, Partner or President

Print Name: _GABRIELLE ALEXIS_    Title: _Attorney_

NOTE: THIS APPLICATION MUST BE SIGNED BY A PRINCIPAL, PARTNER OR PRESIDENT OF THE FIRM ACTING AS THE AUTHORIZED AGENT OF THE APPLICANT.

MAY-19-2009 09:49 From:                                                    To:13055771063                 P.28/87

Nov. 18. 2008  2:51 PM                                    No. 3729    P. 3              11/19/08

# Medmarc Casualty Insurance Company
## PROMARC® Preferred Lawyers Program
### SUPPLEMENTAL APPLICATION

FIRM NAME  _Law Offices of Ganelle Alexis, P.A._

## Financial Institutions:

1. Have any attorneys ever performed services on behalf of a financial institution other than those listed below?
   Bankruptcy - Loan workout - Title Work/Conveyances - Collection - Loan Documentation  - Real Estate Closings - Foreclosures
   Yes____ No _✓_ If Yes, please describe services performed, the name of the financial institution, the years the services were rendered and indicate whether the institution is still a client.

   _____

2. Has any attorney ever provided advice on regulatory matters or acted as Regulatory Counsel to a financial institution?
   Yes____ No _✓_  If Yes, provide full details on firm letterhead.

3. Has any attorney ever acted as officer, director, general counsel or served on any committee for a financial institution?
   Yes____ No _✓_   If Yes, provide full details on firm letterhead.

## P.I./P.D. Plaintiff Litigation and/or Civil Rights/Discrimination:

1. What is the average number of years experience in this area of practice for the attorneys who practice plaintiff litigation in your firm? _16 yrs_
2. Average Case load per attorney in the past twelve months _60_
3. What percentage of your plaintiff cases are:
   Auto Accidents _90_ % Slip & Fall _10_ % Product Liability____% Medical Device Product Liability ____%
   Medical Malpractice ____% Legal Malpractice ____% Class action/Mass tort ____% Other ____%
4. Percentage of cases: settled before trial? _90_ %  cases tried to conclusion? _10_ % other ____%
5. What is the estimated average dollar size of judgments, awards, and settlements in BI/PI and/or civil rights/discrimination plaintiff cases handled by the firm $ _15,000_
6. Have you ever handled, currently handle or intend to handle or be involved in class action/mass tort matters?
   Yes____ No _✓_ If Yes, please describe. _____

7. Please indicate the three (3) largest settlements/awards within the past 24 months and the type of case involved
   $ _300,000_      Type of case _PI Auto_
   $ _50,000_       Type of case _PI Auto_
   $ _22,500_       Type of case _PI Auto_
   NOTE: Please provide on firm letterhead a complete description of any settlement/award in excess of $500,000.

8. Do you advertise on radio or TV? Yes _✓_ No____ If Yes, please attach a transcript of the advertisement.
9. Do you accept cases in which there are less than 3 months before the expiration of the Statute of Limitations?
   Yes____ No _✓_
   If Yes, describe on letterhead the steps taken to ensure that the lawsuit is filed prior to the expiration date.

## Healthcare/Employee Benefits/Pension/ERISA

Describe in detail services performed in these areas of law:  _None_

_____
_____

P003 Promarc App. Supplemental - 100705

DEAN INS. AGENCY, INC.           Page 1 of 4
250 N. WESTMONTE DR.
SUITE 2100
ALTAMONTE SPGS  FL 32714

MAY-19-2009 09:49 From:

Nov. 19. 2008  2:51PM                                      No. 3729   F. 4        11/19/08

**Real Estate:**
1. **Title Work**
   Do you act as a title agent?              Yes ✓ No___
      If Yes, answer the following questions:
      a. What is the total number of title insurance policies issued in the past 12 months: 30
      b. What is the total commission income from all title policies issued in the past 12 months: $30,000
      c. After inquiry, is Applicant aware of any defect in title that was not reported in a title insurance policy issued by
         Applicant? Yes___ No ✓ If Yes, provide full details on a PROMARC Claim/Incident Supplement.
      d. After inquiry, is Applicant aware of any demand claim or suit made within the past five years against insured
         Applicant under a title insurance policy issued by Applicant? Yes___ No ✓
         If yes, provide full details on a PROMARC Claim/Incident Supplement

2. Do you require title agency coverage (available only for entities which are wholly owned by Applicant) Yes___ No ✓
   If Yes, complete a PROMARC Title Insurance Agency Questionnaire.

3. **Residential Real Estate**
   a. What is the total number of Residential transactions handled by the firm in the past 12
      months: N/A

4. **Commercial Real Estate**
   a. What is the total number of Commercial transactions handled by the firm in the past 12
      months: 2
   b. What is the dollar value of the three largest commercial transactions handled by the firm in the past 12 months:
      1) $ 300,000   2) $ 1,275,000   3) $ _____

5. What % of Applicant's gross billings for the last year were derived from the following:
   Residential closings  8%          Commercial closings  6%
   Condo conversions  0             Escrow Agent  0
   Landlord/Tenant  0               Syndication/Development  0

6. Is anyone in the firm involved in Speculative Real Estate? (Speculative real estate means representation of
   developers or principals in their endeavors to attract investors. Services include the preparation of promotional
   documents, procuring potential investors on behalf of the developer or principal, and similar services.)
                                                                          Yes___ No ✓
   If Yes, please provide a summary of such activities. Include % of gross billings from that activity.

   _____
   _____
   _____

7. What % of gross billings for the last year were derived from:
   Limited Partnerships  0%            Syndication Offerings  0%

8. Does anyone in the firm act in any role other than a legal representative?    Yes___ No ✓

9. Does the firm offer advice or issue opinions on any matters related to zoning or environmental issues?
   Yes___ No ✓ If Yes, please explain:

   _____
   _____
   _____

9003 Promarc App. Supplemental - 100705

Nov. 18  2008  2:52PM                                    No 3729    P. 5        11/19/08

## Energy/Natural Resources

1. Please provide full description of energy/natural resources services: *None*

## Intellectual Property

1. Indicate % for each of the following areas:  Patent __0__ %  Copyright __0__ %  Trademark __0__ %

2. Describe the work performed in each area: *None*

## Fee Dispute
For each suit filed against clients for unpaid legal fees filed in the past 24 months, provide the following information.  If additional space is needed, continue on firm letterhead.   *N/A*

|                                                                    | Suit #1 | Suit #2 | Suit #3 |
|--------------------------------------------------------------------|---------|---------|---------|
| Name of Client                                                     | *None*  |         |         |
| Date lawsuit filed                                                 |         |         |         |
| Amount of claim                                                    |         |         |         |
| Nature of underlying matter                                        |         |         |         |
| Status (open, closed in favor of client/firm, settled, etc.)       |         |         |         |
| Steps taken to avoid malpractice counterclaim                      |         |         |         |

## Entertainment/Sports

Describe in detail services performed in these areas of law:  *None*

9003 Profmars App, Supplemental - 100709

MAY-19-2009 09:49 From:

Nov. 18. 2008  2:52PM                                    No.3729   P. 6        11/19/08

**Securities or Utilities**
Describe in detail services performed in these areas of law:  *None*

_____

_____

_____

**Corporate/Personal Tax Opinions**
Describe in detail services performed in these areas of law:  *None*

_____

_____

_____

**Government/Municipal**

For each governmental entity represented, provide the following information. If additional space is needed, continue on firm letterhead.  *None*

| | Entity #1 | Entity #2 |
|---|---|---|
| Name of Governmental Entity | | |
| Name of attorney(s) providing services | | |
| Describe Legal Services Provided | | |
| Is/Are attorney(s) considered employees of Governmental entity? (Yes/No) | | |
| Do attorney(s) seek Public Officials Coverage? (Yes/No) | | |
| Describe attorney's involvement in Municipal Bond work on behalf of Governmental Entity: | | |

I understand information submitted herein becomes a part of my Professional Liability Application and is subject to the same representations and conditions.

AUTHORIZED PRINCIPAL OF APPLICANT          11-17-08
                                            DATE

9003 Promarc App. Supplemental - 100705

MAY-19-2009 09:49 From:                                                    To:13059774005

                                                                                    11/14/08



**THE FLORIDA BAR**
RIVERGATE PLAZA, SUITE M-100
444 BRICKELL AVENUE
MIAMI, FL 33131-2404

305/377-4445
WWW.FLABAR.ORG

JOHN F. HARKNESS, JR.
EXECUTIVE DIRECTOR

September 8, 2003

Deguer Jean Baptiste
1093 Southwest 25th Place
Boynton Beach, Florida 35426

RE:  *Your complaint against Gabrielle Alexis*
     *The Florida Bar File No. 2003-71,212(11P)*

Dear Mr. Baptiste:

Your complaint against the above referenced attorney has been referred to me for my review and appropriate consideration.

Having reviewed the entire grievance file, please be advised that your complaint does not evidence that the accused attorney has acted unethically or in violation of the Rules Regulating The Florida Bar. The reasons for this finding are as follows:

> You allege that Ms. Alexis failed to advise you of and appear at a 1999 hearing in your immigration proceeding. Ms. Alexis states that she was only retained to secure your release from detention. In support of her contention she provides a retainer receipt for $400.00, court appearances calendered for dates prior to your release and a closed file indication from the court prior to your deportation order. These documents appear to support Ms. Alexis' position.

Accordingly, I have closed our file in this matter. Please be advised that my action does not preclude you from consulting with private counsel, nor does it preclude you from exercising any legal or equitable remedies which may be available to you.

Sincerely,

WILLIAM MULLIGAN
Bar Counsel

WM\ep

cc:    Gabrielle Alexis, Esq.

MAY-19-2009 09:49 From:                                                TO:13059774085    P.95-97

11/14/08

P.S. - Please note that The Florida Bar will retain our now closed file on this matter for a period of one (1) year from the date of this letter. Our file will then be destroyed at the conclusion of this one (1) year period. Accordingly, you may wish to maintain a complete copy of the file as it relates to this grievance including, but not limited to, the initial complaint, response thereto, and The Florida Bar's letter advising of the disposition.

MAY-19-2009 09:49 From:                                                  To:13055771053    P.34/87

11/14/08



## THE FLORIDA BAR

CYPRESS FINANCIAL CENTER, SUITE 900
5900 NORTH ANDREWS AVENUE
FT. LAUDERDALE, FL 33309

954/772-2245
www.FLABAR.ORG

JOHN F. HARKNESS, JR.
EXECUTIVE DIRECTOR

September 23, 2005

<u>PERSONAL/FOR ADDRESSEES ONLY</u>

Cedine Jeane Jacques
390 Northeast 125th Street, #401
North Miami, FL 33161

RE:    Complaint against Gabrielle Alexis
       The Florida Bar File No. 2006-50,015(15E)

Dear Ms. Jacques:

The Florida Bar reviewed your complaint with attachments against Gabrielle Alexis, Esq., as well as her response, and your rebuttal. After a staff level review of the information provided, it is our determination that there is insufficient evidence to conclude that Ms. Alexis violated the Rules Regulating The Florida Bar.

At the outset, you should note that the Bar cannot change anything that happened in your dissolution of marriage action nor change the outcome of the same. Our role is to examine whether an attorney violated a rule of ethics and if so, what discipline should be imposed on that attorney.

You retained the firm of Mondesir & Alexis, P.A. in 2001 for representation in a contested dissolution of marriage action – <u>Arnold Mathieu v. Cedine Jean Jacques</u> – Miami Dade County Case No. 01-31022-FC04. Gabrielle Alexis, Esq., is a named partner of the firm of Mondesir & Alexis, P.A. You paid the firm a retainer of $500.00. Mr. Bullock, an associate of the firm of Mondesir & Alexis, P.A, began working on your case in January of 2002. Mr. Bullock's efforts in furtherance of your case consisted of attending hearings, responding to and propounding discovery, and attending mediations. Mr. Bullock left the firm in December of 2003 and ceased involvement in your matter. The firm contacted you in writing in August of 2004 to advise you that they were terminating the representation based upon their inability to contact you and your inability to pay their fees. Your dissolution was finalized and you recently retained new counsel and filed a petition for modification of the final judgment seeking additional child support and medical coverage. You filed this complaint in July of 2005 as a result of what you believe to Ms. Alexis' mishandling of your case.

Ms. Alexis responded that Mr. Bullock handled your matter and that she assisted in a supervisory capacity. She provided copies of several letters, pleadings and invoices evidencing the work done in furtherance of your case. You refute Ms. Alexis' response in its entirety, but provide no

11/14/08

Page 2

evidence or correspondence to substantiate your claims. As part of our investigation, we contacted Attorneys Eric Hospedales and Frank Murray, former and current counsel for your former husband respectively. Based upon the information provided and our inability to conclusively establish any misconduct on Mr. Bullock's part, we could not determine that the representation fell below the standard of care.

Accordingly, the Bar will not be pursuing further investigation of this matter and our file is now closed. Please note that the foregoing action does not preclude you from pursuing any available legal or equitable remedy. Since this office cannot provide you with legal advice, you should consult with counsel of your choice as to how best to proceed.

Thank you for your efforts in presenting this matter to The Florida Bar, as well as for your anticipated understanding of the basis for closing this investigation.

Very truly yours,

Lillian Archbold
Bar Counsel

LA/oak

cc:    Gabrielle Alexis

## IMPORTANT NOTICE TO COMPLAINANT AND RESPONDENT ATTORNEY

PLEASE NOTE THAT THE FLORIDA BAR'S FILE ON THIS MATTER WILL BE RETAINED FOR ONE (1) YEAR AND THEN DESTROYED. THEREFORE, IT IS SUGGESTED THAT EACH OF YOU RETAIN A COPY OF THE SUBJECT FILE FOR FUTURE REFERENCE, IF NEEDED.

O:\LILLIAN\FORMS\STAFF LEVEL\STAFF-COMPLAIN\CLO.DOC

MAY-19-2009 09:50 From:

Nov. 18. 2008  2:53PM                                          No. 3729   P. 8

11/24/08

**Administrators for the Professions of
Delaware, Inc.**
Program Administrator
One Hollow Lane, Suite 204
Lake Success, New York 11042

# Medmarc®

## Medmarc Casualty Insurance Company
### PROMARC® Preferred Lawyers Program

### FLORIDA ACCEPTANCE AND NO KNOWN LOSS STATEMENT

I/We accept the policy terms, conditions and the premium quotation offered by Medmarc
Casualty Insurance Company on  11/19/08       I/We understand that the coverage and
premium offered was based on the information contained in the application of
completed and signed on  11-11-08  *Zurich*  that was

The statements and information set forth in the application are true, complete, and
accurate as of the date noted below. I/We acknowledge and agree that the "Company"
referred to in the application shall be Medmarc Casualty Insurance Company. The
representations, duties and obligations of all parties remain unaffected.

I/We agree that the application shall become the basis of any coverage and a part of any
policy that may be issued by Medmarc Casualty Insurance Company.

*Law Offices of Gabrielle Alexis*
Firm Name

*[signature]*
Signature

*11 - 17 - 08*
Date

9006 Promarc App. Acc. and NKL - 100705

MAY-19-2009 09:50 From:                                                      To:13055771063    P.37/87

Nov. 18. 2008  2:55PM                                                 No. 3729   P. 2        11/19/08

## ALLSOUTH
PROFESSIONAL LIABILITY, INC

P.O. Box 66689
St. Pete Beach, FL 33736-66689
Phone (813) 288-0990  Fax (813) 282-0994



### PROMARC
### MEDMARC CASUALTY INSURANCE COMPANY

### PREFERRED LAWYERS PROFESSIONAL LIABILITY PROGRAM

### EMPLOYMENT PRACTICES LIABILITY QUESTIONNAIRE

1.  (A)   During the past five years, has any claim for wrongful termination, employment discrimination, employment-related harassment including sexual harassment, or violation of any law or ordinance pertaining to employee benefits for any employee been made against any Applicant? Yes No

(B)   Does any Applicant know of any act, error, omission or circumstance that could reasonably give rise to a claim for wrongful termination, employment discrimination, employment-related harassment including sexual harassment, or violation of any law or ordinance pertaining to employee benefits for any employee against the firm, any predecessor in business listed in Supplement 2 or any past or present attorney(s) in the firm? Yes No

*If question 1 (A) or (B) is "Yes," complete the PROMARC Claim/Incident Supplement for each claim/incident. (Important: "Applicant" includes all attorneys for whom coverage is sought under the policy.)*

2.  (A)   During the past five years, has there been any grievance proceeding or other administrative hearing before any federal or state commission, board, or agency, brought against any Applicant in connection with the violation of any civil rights law or act or labor relations law or act concerned with employment discrimination? Yes No

(B)   Does any Applicant know of any act, error, omission or circumstance that could reasonably give rise to a grievance proceeding or other administrative hearing before any federal or state commission, board, or agency in connection with the violation of any civil rights law or act or labor relations law or act concerned with employment discrimination against the firm, any predecessor in business listed in Supplement 2 or any past or present attorney(s) in the firm? Yes No

*If question 2 (A) or (B) is "Yes," complete the PROMARC Claim/Incident Supplement for each claim/incident. (Important: "Applicant" includes all attorneys for whom coverage is sought under the policy.)*

I/we hereby declare that the above statements and particulars are true and that I/we have not omitted, suppressed or misstated any material fact(s).

It is understood and agreed that the completion of this questionnaire and supplements thereto does not bind the Company to issue or the Applicant to purchase insurance.

Law Offices of Gabrielle Alexis, P.A.
Firm Name

_____
Signature

11-17-08
Date

PLAPP-2008 Rev. 6/02

## MEDMARC CASUALTY INSURANCE COMPANY

### PREFERRED LAWYERS PROFESSIONAL LIABILITY PROGRAM

### DECLARATIONS PAGE

**THIS IS A CLAIMS-MADE POLICY WITH DEFENSE COSTS INCLUDED WITHIN THE LIMITS OF LIABILITY -- PLEASE READ IT CAREFULLY.  ALL TERMS IN QUOTATIONS MARKS ARE DEFINED IN THE POLICY.**

POLICY NUMBER:           08APFL02716

ITEM 1.    "Named Insured":    Law Offices of Gabrielle Alexis, P.A.
           Address:            1325 Congress Avenue
                               Suite 100
                               Boynton Beach, FL 33426

ITEM 2.    "Policy Period":    From:  November 24, 2008   To:  November 24, 2009
                               (12:01 A.M. Standard Time at the address stated in Item 1.)

ITEM 3.    Limits of Liability:   $  500,000    Each "Claim"
                                  $ 1,000,000   Aggregate
           Deductible:            $  2,500      Each "Claim"
                                  $  2,500      Aggregate

ITEM 4.    Coverage Dates:
           "Retroactive Date" for all "Insureds" unless indicated otherwise in an Endorsement
           attached to this Policy: November 24, 2008

ITEM 5.    Annual Premium:                           $  1,771.00
              Guaranty Fund Assessment:              $     0.00
              Hurricane Fund Assessment:             $    18.00
              FIGA Emergency Fund Assessment: $     0.00
           Total Cost Of Policy:                     $  1,789.00

ITEM 6.    COVERAGE UNDER YOUR POLICY IS SUBJECT TO THE TERMS AND CONDITIONS OF
           THE ENDORSEMENTS ATTACHED TO THIS POLICY.

ITEM 7.    Number of Attorneys at Policy Inception: One (1)

           _____                    Date Issued:  12/01/2008
           Authorized Representative

Countersigned By:  _____            Date: _____
(if required)

LPL DEC-1000 Rev. 11/05



# NOTICE OF EMERGENCY ASSESSMENT

## FLORIDA HURRICANE CATASTROPHE FUND

### PLEASE DO NOT DISCARD WITHOUT READING

---

The Florida Office of Insurance Regulation ("OIR") has imposed an emergency assessment to support the Florida Hurricane Catastrophe Fund. The 1% assessment is effective on policies having an effective date of January 1, 2007 and the assessment is to continue until OIR directs insurers to stop collecting the assessment.

In accord with OIR regulations, Medmarc Casualty Insurance Company has imposed a 1% premium surcharge on policies written in Florida with an effective date of January 1, 2007 or later. The surcharge and corresponding amount appears as a separate line item on your premium notice.

FL NOE HCF 080106

**Medmarc Casualty Insurance Company**

3001 LPL END Rev. 11/05
Page 1 of 1

## SCHEDULE OF ENDORSEMENTS

2005 LPL Form Rev. 11-21-05
LPL DEC-1000 Rev. 11/05
PLP-1001 Rev. 1/07   - Policy Jacket
FL NOE HCF 080106
3001 LPL END Rev. 11/05
3022 LPL END Rev. 11/05
3027 LPL END Rev. 11/05
4000 LPL END FL Rev. 03/05
4001 LPL END FL Rev. 03/05

### AT POLICY INCEPTION

ENDORSEMENT NO.:  1

ISSUED TO: Law Offices of Gabrielle Alexis,
P.A.

POLICY NO.: 08APFL02716

EFFECTIVE DATE: 11/24/2008

BY /s/ Irwin F. Giles
Authorized Representative

# LAWYERS
## PROFESSIONAL LIABILITY POLICY

# Medmarc Casualty Insurance Company
### (A Stock Insurance Company)

**THIS IS A CLAIMS MADE AND REPORTED POLICY**

## THIS POLICY CONSISTS OF:

- **DECLARATIONS**
- **COVERAGE SECTIONS**
  - **COVERAGE FORMS**
  - **ENDORSEMENTS, IF ANY**
- **SPECIAL PROVISIONS APPLICABLE TO ALL SECTIONS**

## Medmarc Casualty Insurance Company

### (A stock insurance company, hereinafter called the "Company")

## Preferred Lawyers Professional Liability Policy

### NOTICES

This is a "Claims" Made and Reported Policy. Subject to all its terms, conditions, limitations, exclusions and Limits of Liability, this Policy provides insurance coverage only for "Claims" resulting from the performance of, or failure to perform, "Professional Services", and which are first made against the "Insured" during the "Policy Period" or an Extended Reporting Period and reported in writing to the Company during the "Policy Period" or an Extended Reporting Period.

The Limits of Liability under this Policy will be reduced, and may be exhausted, by payment of any "Claim Expenses" and "Damages" that are paid by the Company on behalf of any "Insured".

Certain words and phrases that appear herein have the meanings set forth in SECTION II: DEFINITIONS of this Policy. When the context so indicates or requires, each word or phrase in this Policy that is stated in the singular includes the plural, and each such word or phrase stated in the plural includes the singular.

It is a condition precedent to coverage under this Policy that all "Claims" be timely reported to the Company. See SECTION VI., F. Notice of "Claims".

In consideration of: 1) the payment of the premium stated in the Declarations; 2) the undertaking to pay the Deductible in the amounts stated in the Declarations, as described herein; 3) in reliance upon the statements in the application, and in all additional materials submitted by any "Insured" in applying for this Policy or for any prior Policies issued by this Company, which applications and other materials are made a part of this Policy; 4) subject to the Limits of Liability shown in the Declarations; and 5) subject to all of the terms of this insurance, the Company agrees with the "Insureds" as follows:

## SECTION I: INSURING AGREEMENT

### A. Professional Liability "Claims" Made and Reported Insuring Clause

The Company shall pay on behalf of the "Insured" all sums, in excess of the Deductible, that the "Insured" shall become legally obligated to pay as "Damages" because of a "Claim" resulting from an act or omission in the performance of, or failure to perform, "Professional Services" , but only if such "Claim" is: 1) first made against the "Insured" during the "Policy Period" or an Extended Reporting Period; and 2) reported in writing to the Company during the "Policy Period" or an Extended Reporting Period.

A "Claim" first made against any "Insured" during a prior policy issued by the Company, but which "Claim" is first reported to the Company during the "Policy Period" or an Extended Reporting Period, is not a "Claim": 1) first made against the "Insured" during the "Policy Period" or an Extended Reporting Period; and 2) reported in writing to the Company during the "Policy Period" or an Extended Reporting Period, as required by this Insuring Agreement.

The insurance provided by this Policy only applies if the act or omission or "Related act or omission" that is the basis for the "Claim" happens either:

1. during the "Policy Period"; or

2. prior to the "Policy Period" and on or after the "Retroactive Date", if any, but only if all of the following conditions are satisfied:

    (a) prior to the "Policy Period", no "Insured" gave notice of such act or omission or any "Related act or omission" to any other insurer or to the Company; and

    (b) prior to the "Policy Period", no "Insured" had: i) a reasonable basis to believe that any such act or omission or any "Related act or omission" was a breach of a professional duty; or ii) a reasonable basis to foresee that such act or omission or "Related act or omission" could result in a "Claim" against any "Insured"; and

    (c) subject to the limitations contained in SECTION IV: EXTENDED REPORTING PERIODS, there is no other policy that provides coverage for such "Claim", unless the available limit of liability of such policy is insufficient to pay any "Claim", in which event this Policy will be excess over such policy.

B. Changes in "Named Insured"

If, during the "Policy Period", the "Named Insured" or a "Scheduled Title Agency" adds any attorney who was not previously identified to the Company as an "Insured" under this Policy, such attorney shall be deemed an "Insured", irrespective of whether the addition of such attorney results in a change in the firm name or type of business organization of the "Named Insured" or a "Scheduled Title Agency", provided that the Company is given written notice of the addition of such attorney within 30 days of the effective date of his or her addition, but not later than the expiration date of this Policy, and the addition of such attorney, alone or together with any other added attorneys, does not affect the nature or character of the risk insured by the Company when it issued this Policy.

Should the addition of such attorney, alone or together with other added attorneys, affect the nature or character of the risk insured by the Company, then the Company shall have the right to:

1. adjust the premium; or

2. re-underwrite the Policy; or

3. decline to insure the new risk(s).

## SECTION II: DEFINITIONS

Whenever used in this Policy, the term:

A. **"Business Enterprise"** means any corporation, entity, association, partnership, limited partnership, joint venture, fund, proprietorship, sole proprietorship, organization, trust, business venture, business pursuit, business transaction, or any other business activity of any kind or nature, including charitable or non-profit ones, other than the **"Named Insured"**, a **"Scheduled Title Agency"**, or a **"Predecessor Firm(s)"**;

B. **"Claim"** means a demand for money or services made against any **"Insured"**, including service of a suit, arbitration proceedings or a motion against any **"Insured"**, alleging negligent acts or negligent omissions, or alleging **"Personal Injury"**, resulting from the performance of or failure to perform **"Professional Services"** by any **"Insured."** A **"Claim"** includes any complaint, grievance or other allegation of wrongdoing made against any **"Insured"** to any disciplinary agency or board. A **"Claim"** is deemed "made" against any **"Insured"** when any **"Insured"** first receives notice, either oral or written, of such **"Claim"**.

C. **"Claim Expenses"** means the following arising out of a **"Claim"** for **"Damages"** or out of a matter reported under SECTION III., D. Discovery Clause:

Fees charged by any attorney designated by the Company; and

1. All other fees, interest, costs and expenses paid or owed by the Company and arising out of any investigation, adjustment, defense or appeal, other than the salaries and benefits paid to employees of the Company.

D. **"Damages"** means any compensatory monetary judgment or award, or any settlement consented to by the Company, but does not include any of the following or any injuries that are a consequence thereof:

1. Punitive or exemplary amounts in a judgment or award, or the multiplied portion of any judgments or awards, against any **"Insured"** or others;

2. Compensatory amounts for mental anguish, emotional or mental distress, or humiliation, except amounts for mental anguish, emotional or mental distress, or humiliation caused by **"Personal Injury"**; or

3. Any statutory or other fine, any penalty, or any administrative or court-imposed monetary sanction of any kind against the **"Insured"** or others; or

4. **"Claim Expenses"**; or

5. Any overcharge for, return of, refund of, restitution of, or offset due for legal fees or costs, or any other consideration paid to, or payable to, or received by any **"Insured"**; or

6. Alteration of a previously agreed upon charge for legal fees and/or costs paid or payable to any **"Insured"** or to anyone else; or

7. Money that an **"Insured"** owes another attorney for any legal fees and/or costs paid or payable to any **"Insured"**.

E. **"Insured"** means:

1. Any present or past partner, principal, shareholder, member, officer, director, "of counsel," sole shareholder professional corporation, or employed attorney of the **"Named Insured"**, but only for **"Claims"** resulting from the performance of, or failure to perform, **"Professional Services"** on behalf of the **"Named Insured"** or a **"Predecessor Firm(s)"**;

2. If an Endorsement to the Policy provides "Career Coverage" for a particular attorney, such attorney is an **"Insured"** only for: 1) **"Claims"** resulting from the performance of, or failure to perform, **"Professional Services"** services on behalf of the **"Named Insured"** or a **"Predecessor Firm(s)"**; and 2) **"Claims"** resulting from the personal performance of, or failure to perform, **"Professional Services"** on or after the **"Retroactive Date"** and prior to the date that he or she joined the **"Named Insured"** or a **"Predecessor Firm(s)"** and not for any such **"Claims"** based solely on vicarious, derivative or similar liability of such attorney based on the acts or omissions of others;

3. Any present or past partner, principal, shareholder, member, officer, director, or employee of a **"Scheduled Title Agency"** for **"Claims"** resulting from the performance of, or failure to perform, **"Professional Services"** on behalf of a **"Scheduled Title Agency"**;

4. Any non-attorney who was, is now, or hereafter becomes an employee of the **"Named Insured"** for acts or omissions within the scope of such person's employment for the **"Named Insured"** or a **"Predecessor Firm(s)"**.

5. A **"Scheduled Title Agency"**;

6. A **"Predecessor Firm(s)"** only if it was dissolved or ceased the practice of law as of the date the **"Named Insured"** was created.

2005 LPL Form Rev 11-21-05                                                    Page 4 of 22

7. The **"Named Insured"**; and

8. In the event of the death, incapacity or bankruptcy of any natural person **"Insured"**, the heirs, executors, administrators, assigns and legal representatives thereof.

F. **"Named Insured"** means the person or entity designated in the Declarations.

G. **"Permanent Total Disability"** means: 1) permanent, total and continuous disability as a result of sickness, or accidental bodily injury that prevents a natural person **"Insured"** from rendering **"Professional Services"** to others; or 2) death.

H. **"Personal Injury"** means:

1. False arrest, false imprisonment, wrongful entry or eviction or other invasion of private occupancy, malicious prosecution, or abuse of process; or

2. The publication or utterance of a libel or slander or other defamatory or disparaging material or a publication or an utterance in violation of an individual's right of privacy.

I. **"Policy Period"** means the period from the inception date of this Policy to the earlier of the Policy expiration date as set forth in the Declarations or the cancellation of the policy.

J. **"Pollutants"** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acid, alkalis, chemicals and waste. "Waste" includes material to be recycled, reconditioned or reclaimed.

K. **"Predecessor Firm(s)"** means any law firm engaged solely in the private practice of law and from which 50% or more of the attorneys join the "Named Insured".

L. **"Professional Services"** means:

1. Services performed by an **"Insured"** for others as an attorney, speaker, author of legal treatises, arbitrator, mediator, title agent, bankruptcy trustee, or notary public, but only while all necessary licenses are in effect; and

2. Services performed by an **"Insured"** in connection with any bar association, its governing body, or any of its committees; and

3. Services as an administrator, conservator, receiver, executor, guardian, trustee, committee of an incompetent person, or services performed in any similar fiduciary capacity, but only for those services typically and customarily performed by an attorney. This coverage shall not apply to any loss or **"Damages"** sustained by the **"Insured"** as the beneficiary or distributee of any trust or estate; and

4. As to a "**Scheduled Title Agency**", only those title agency services performed by any "**Insured**" for a "**Scheduled Title Agency**" and that are of a type typically and customarily performed by title agencies.

M. "**Related act or omission**" means all acts or omissions resulting from the performance of, or failure to perform, "**Professional Services**" that are temporally, logically or causally connected by any common fact, circumstance, situation, transaction, event, advice or decision.

N. "**Retires**" or "**Retired**" means the permanent, complete and voluntary cessation of the practice of law.

O. "**Retroactive Date**" means the date listed in the Declarations, or in an Endorsement to this Policy, on or after which the act or omission, and any "**Related act or omission**", that forms the basis of a "**Claim**" must occur in order for coverage to be applicable and no coverage will apply to any "**Claim**" based upon or arising out of any act or omission or "**Related act or omission**" that occurs prior to the "**Retroactive Date**".

P. "**Scheduled Title Agency**" means a title agency listed in the Declarations or in an Endorsement to this Policy and which is fully and completely owned by one or more attorneys otherwise insured under this Policy.

Q. "**Securities Work**" means all acts or omissions relating in any way to a sale, a purchase, an offer to sell or purchase, or the solicitation of an offer to sell or purchase, a security covered, or claimed to be covered, in whole or in part by: The Securities Act of 1933, The Securities Exchange Act of 1934, The Investment Advisors Act of 1940, or any other Federal or State Blue Sky or Securities Law, or any rules or regulations issued pursuant to any of the aforementioned, or any amendments or replacements thereof.


## SECTION III:    DEFENSE, CONSENT TO SETTLE, LOSS OF EARNINGS ALLOWANCE AND DISCOVERY CLAUSE

### A. Defense

1. The Company shall have the right and duty to defend a "**Claim**" made against any "**Insured**" seeking "**Damages**" within the scope of coverage provided by this Policy, even if the allegations of such "**Claim**" are groundless, false or fraudulent. The Company shall have the right to appoint counsel to investigate and defend any "**Claim**". Any "**Claim Expenses**" that are paid by the Company will be applied against the Company's Limits of Liability under this Policy, and the Company's Limits of Liability under this Policy will be reduced, and may be exhausted, by the Company's payment of "**Claim Expenses**", at which point of exhaustion the Company has no further duty to defend.

2.  If, notwithstanding the Company's right to defend as set forth in the preceding paragraph, the law entitles the "**Insured**" to select its, his or her own attorney at the Company's expense, the attorney's fees and all other litigation expenses that the Company must pay are limited to the rates the Company typically pays to counsel and others that the Company retains in the ordinary course of its business in the defense of similar "**Claims**" in the community where the "**Claim**" is being investigated or defended. The Company has the right to require that such counsel: a) be someone other than an "**Insured**"; b) have certain minimum qualifications with respect to competency, including experience in defending claims similar to the one pending against the "**Insured**"; and c) and have errors and omissions insurance coverage with limits acceptable to the Company. Such counsel will timely respond to the Company's requests for information regarding any "**Claim**" and follow the Company's reasonable litigation management guidelines. The "**Insured**" agrees that it will instruct such counsel to comply with all requirements in this paragraph.

3.  If there is no coverage, in whole or in part, for any "**Claim**", lawsuit, or other action investigated or defended or settled by the Company, or for any judgment paid by the Company, then the Company shall have the right to recover all amounts paid or owed by the Company on such uncovered matters from the "**Named Insured**" and any "**Insured**" on whose behalf these amounts were incurred or paid.

B.  **Consent to Settle**

The Company shall not settle any "**Claim**" without the prior consent of the "**Named Insured**", unless otherwise agreed by the Company and further subject to the other provisions of this section.

No "**Insured**" shall enter into any settlement of, or agreement with respect to, any "**Claim**" without the Company's prior written consent.

If the "**Named Insured**" refuses to consent to a settlement recommended by and acceptable to the Company, as determined by the Company in its sole discretion, and acceptable to the claimant, and elects to contest the "**Claim**" or continue any legal proceedings in connection with such "**Claim**", then the Company shall be relieved of any further duty to defend the "**Claim**" and the liability of the Company for defense, settlement or judgment amounts incurred by any "**Insured**" thereafter shall not exceed: 1) the amount of the settlement agreed to by the Company and the claimant; 2) "**Claim Expenses**" incurred by the Company up to the date of the "**Insured's**" refusal; and 3) additional amounts as provided in this Paragraph B.

The amount of the settlement agreed to by the Company and the claimant shall be deemed to be "**Damages**" and shall reduce the Limits of Liability of the Company, as provided in SECTION VI, C. Limits of Liability, to the extent any such funds are paid to any "**Insured**" and regardless of whether the "**Insured**" uses these funds for defense or to satisfy a settlement or judgment.

In addition to the amounts paid by the Company under the foregoing provisions of this Paragraph B., the Company agrees to reimburse the **"Insured"** twenty-five percent (25%) of any additional amounts paid by the **"Insured"** for defense of, settlement of, or judgment on any such **"Claim"**. The Company's additional reimbursement shall not exceed fifty percent (50%) of the remaining Limit of Liability applicable to such **"Claim"** after payment to the **"Insured"** of the amount of the settlement agreed to by the Company and the claimant. Payment of this additional twenty-five percent (25%) to the **"Insured"** shall be deemed to be **"Damages"** and shall reduce the Limits of Liability of the Company as provided in SECTION VI, C. Limits of Liability.

All amounts incurred by any **"Insured"** after the Company's withdrawal from the defense shall be reimbursed only upon presentation to the Company of reasonable proof that such amounts have actually been paid by the **"Insured"**.

## C. Loss of Earnings Allowance

With respect only to the defense of a civil lawsuit or arbitration, the Company shall pay a natural person **"Insured"** a loss of earnings allowance of $250 for each half-day the **"Insured"** attends a trial or arbitration, or attends a deposition, at the request of the Company. This payment only applies if the Company requests that the **"Insured"** attend such proceedings and those proceedings last for two days or more. The aggregate allowance paid to all **"Insureds"** shall not exceed $5,000 per **"Claim"** and further shall not exceed $5,000 per **"Policy Period"**.

## D. Discovery Clause

If, during the **"Policy Period"** or an Extended Reporting Period, an **"Insured"** first has: 1) a reasonable basis to believe that any act or omission by any **"Insured"** was a breach of a professional duty; or 2) a reasonable basis to foresee that such act or omission could result in a **"Claim"** against any **"Insured"**, the **"Insured"** shall, during the **"Policy Period"** or an Extended Reporting Period during which such reasonable basis first arises, give written notice to the Company as soon as practicable of:

1.  the specific act or omission; and

2.  the injury, damage or breach which has or may result from such act or omission; and

the circumstances by which any **"Insured"** first became aware of such act or omission.

The report to the Company in compliance with this Paragraph D. shall be deemed, as between the **"Insured"** and the Company, a **"Claim"** first made against the **"Insured"** and reported to the Company during the **"Policy Period"**. Any **"Claim"** that may subsequently

be made against the **"Insured"** arising out of such act or omission, or **"Related act or omission"**, shall be deemed for the purposes of this insurance to have been made against the **"Insured"** on the date the Company received the notice complying with this Paragraph D. The **"Insured"** shall cooperate fully with the Company as provided in SECTION VI., F. Notice of **"Claims"** and G. Assistance and Cooperation of the **"Insured"**. If a **"Claim"** is thereafter made against any **"Insured"**, notice must be given to the Company in writing in accordance with SECTION VI., F. Notice of **"Claims"**.

### E. Additional Defense Coverage

Notwithstanding the other terms, conditions, limitations and exclusions in the Policy, the Company will pay reasonable legal fees and expenses to defend a grievance or complaint against an **"Insured"** made to a state attorney licensing or disciplinary agency or board and: 1) first made against any **"Insured"** during the **"Policy Period"** or an Extended Reporting Period; and 2) reported to the Company in writing during the **"Policy Period"** or an Extended Reporting Period.

The Company's liability for defense under this Paragraph E. shall be limited to a maximum of $25,000 for all such proceedings and hearings, and is separate from the Limit of Liability under SECTION VI., C. Limits of Liability. This Paragraph E. shall not apply to any criminal proceedings or proceedings or hearings to determine the reasonableness of, or right or entitlement to, any fee or charge by any **"Insured"**. The **"Insured"** agrees that the Company has the right to investigate and defend any complaint or grievance through counsel designated by the Company, and such investigation and defense is subject to the terms of SECTION III., A. Defense, Paragraph 2, and subject to the $25,000 limit of defense costs. The Loss of Earnings Allowance set forth in SECTION III., C. Loss of Earnings above shall not apply to proceedings or hearings subject to this Paragraph E. The Deductible, as stated in the Declarations, shall not apply to proceedings or hearings subject to this Paragraph E. The allowance paid to all **"Insureds"** shall not exceed $25,000 per incident or **"Claim"** and further shall not exceed $25,000 per **"Policy Period"**.

In the event that the Company has paid the full $25,000, the **"Insured"** agrees that Company may withdraw from defending the **"Insured"** and the Company shall have the right to tender control of said investigation, defense or settlement to the **"Insured"**. The **"Insured"** agrees to assume the obligation to pay, on a going forward basis, the counsel who was originally hired and paid by the Company, or to cooperate in the withdrawal of counsel hired and paid by the Company.

## SECTION IV: EXTENDED REPORTING PERIODS

### A. Basic Extended Reporting Period

If the **"Named Insured"** does not renew this Policy, or if the Company shall cancel or refuse to renew the Policy for reasons other than the **"Named Insured's"** nonpayment of premium, or noncompliance with the terms and conditions of this Policy, a sixty (60) day

Basic Extended Reporting Period shall take effect without an additional premium charge. The Basic Extended Reporting Period applies only to **"Claims"**: 1) resulting from acts or omissions occurring on or after the **"Retroactive Date"**, if any, and prior to end of the **"Policy Period"**; 2) that are first made against the **"Insured"** during the **"Policy Period"**; and 3) that are reported in writing to the Company during the Basic Extended Reporting Period. The Basic Extended Reporting Period commences at the end of the **"Policy Period"**.

The Basic Extended Reporting Period shall not apply if, by the end of the **"Policy Period"**, the **"Named Insured"** has not paid all premiums owed to the Company in full or has not reimbursed the Company in full for all Deductible amounts owed to the Company.

The Basic Extended Reporting Period does not apply to **"Claims"** that are covered under any other insurance, whether issued by the Company or any other insurer, or that would be covered but for the exhaustion of the Limit of Liability thereunder or but for any **"Insured's"** failure to comply with any conditions or terms of the other policy.

The Basic Extended Reporting Period does not extend the **"Policy Period"** or change the scope of coverage provided by this Policy.

The Basic Extended Reporting Period does not reinstate or increase the Limits of Liability of the Policy. The Limits of Liability applicable to **"Claims"** reported to the Company during the Basic Extended Reporting Period shall be the same Limits of Liability that would be applicable if the **"Claim"** had been reported to the Company on the last day of the **"Policy Period"**.

**B.  Other Extended Reporting Periods**

**1.  Optional Extended Reporting Period**

The **"Named Insured"**, upon payment of an additional premium as set forth herein, shall have the option to purchase the Optional Extended Reporting Period for a period of: (a) 12 Months; (b) 24 Months; (c) 36 Months; or (d) an unlimited duration, for **"Claims"**: i) resulting from acts or omissions occurring on or after the **"Retroactive Date"**, if any, and prior to the expiration of the **"Policy Period"**; ii) that are first made against an **"Insured"** during the Basic Extended Reporting Period or during the Optional Extended Reporting Period; and iii) that are reported in writing to the Company during the Optional Extended Reporting Period. If purchased, the Optional Extended Reporting Period will commence at the end of the Basic Extended Reporting Period.

The additional premium for the Optional Extended Reporting Period shall be a percentage of the full annual premium for this Policy, as follows: (a) 100% for 12 Months; (b) 175% for 24 Months; (c) 225% for 36 Months; or (d) 300% for an unlimited duration.

The additional premium for the Optional Extended Reporting Period shall be deemed fully earned when the Optional Extended Reporting Period commences, and in the event the **"Named Insured"** terminates, for any reason, the Optional Extended Reporting Period before its expiration, the Company shall not be liable for the return to the **"Named Insured"** of any portion of the premium for the Optional Extended Reporting Period.

The Optional Extended Reporting Period does not extend the **"Policy Period"** or change the scope of coverage provided. The Optional Extended Reporting Period does not reinstate or increase the Company's Limits of Liability or change the applicability or amount of the Deductible. The Limits of Liability applicable to **"Claims"** reported to the Company during the Optional Extended Reporting Period shall be the same Limits of Liability that would be applicable if the **"Claim"** had been reported to the Company on the last day of the **"Policy Period"**.

The Optional Extended Reporting Period does not apply to any **"Claims"** covered under any other insurance, whether issued by the Company or any other insurer, or that would be covered but for the exhaustion of the limit of liability thereunder or but for the failure of any **"Insured"** to comply with the terms and conditions of that other insurance.

2.  **Optional Non-Practicing Extended Reporting Period**

If, during the **"Policy Period"**, any **"Insured"** who is a natural person **"Retires"**, then such **"Insured"**, upon payment of an additional premium as set forth herein, shall have the option to extend the reporting period of such Policy for such **"Retired" " Insured"**, subject otherwise to its terms, Limits of Liability, exclusions, limitations, and conditions, for a period of: (a) 12 Months; (b) 24 Months; (c) 36 Months; or (d) an unlimited duration, for **"Claims"**: i) resulting from acts or omissions occurring on or after the **"Retroactive Date"**, if any, and prior to the expiration of the **"Policy Period"**; ii) that are first made against the **"Insured"** during the **"Policy Period"** or the Optional Non-Practicing Extended Reporting Period; and iii) that are reported in writing to the Company during the Optional Non-Practicing Extended Reporting Period. If purchased, the Optional Non-Practicing Extended Reporting Period will commence at the end of the **"Policy Period"**.

The additional premium for the Optional Non-Practicing Extended Reporting Period shall be a percentage of the full annual premium for such **"Retired" "Insured"** under this Policy as follows: (a) 100% for 12 Months; (b) 175% for 24 Months; (c) 225% for 36 Months; or (d) 300% for an unlimited duration. The percentages set forth herein are applied to the per lawyer premium, calculated by taking the total premium for the Policy, and dividing it by the number of full-time lawyers for whom a premium was charged by the Company at the commencement of the **"Policy Period"**.

There will be no additional premium for an Optional Non-Practicing Extended Reporting Period of unlimited duration if the natural person **"Insured"** who is seeking the Optional Non-Practicing Extended Reporting Period has maintained coverage with the Company for at least three full consecutive years immediately preceding the date the **"Insured" "Retires"**.

The additional premium for the Optional Non-Practicing Extended Reporting Period shall be deemed fully earned when the Optional Non-Practicing Extended Reporting Period commences, and in the event the **"Insured"** terminates, for any reason, the Optional Non-Practicing Extended Reporting Period before its term, the Company shall not be liable for the return to the **"Insured"** of any portion of the premium for the Optional Non-Practicing Extended Reporting Period.

The Optional Non-Practicing Extended Reporting Period does not extend the **"Policy Period"** or change the scope of coverage provided. The Optional Non-Practicing Extended Reporting Period does not reinstate or increase the Company's Limits of Liability. The Limits of Liability applicable to **"Claims"** reported to the Company during the Optional Non-Practicing Extended Reporting Period shall be the same Limits of Liability that would be applicable if the **"Claim"** had been reported on the last day of the **"Policy Period"**.

The Optional Non-Practicing Extended Reporting Period does not apply to **"Claims"** that are covered under any other insurance, whether issued by the Company or any other insurer, or that would be covered but for the exhaustion of the limit of liability thereunder or but for the failure of any **"Insured"** to comply with the terms and conditions of that other insurance.

3. <u>**Permanent Total Disability Extended Reporting Period**</u>

In the event of the death or **"Permanent Total Disability"** of any natural person **"Insured"** during the **"Policy Period"**, the Company will provide such **"Insured"** with a Permanent Total Disability Extended Reporting Period of an unlimited duration without additional premium for **"Claims"**: i) resulting from acts or omissions occurring on or after the **"Retroactive Date"**, if any, and prior to the expiration of the **"Policy Period"**; ii) that are first made against the **"Insured"** during the **"Policy Period"**, or during the Permanent Total Disability Extended Reporting Period; and iii) that are reported in writing to the Company during the Permanent Total Disability Extended Reporting Period. The Permanent Total Disability Extended Reporting Period will commence and the end of the **"Policy Period"**.

This Paragraph 3 shall not apply if the death or **"Permanent Total Disability"** is the result of suicide or attempted suicide.

The Company's "Each **'Claim'**" Limit of Liability for the Permanent Total Disability Extended Reporting Period shall as stated in the Declarations, and the Company's aggregate Limit of Liability shall be the lesser of two times the "Aggregate" Limit of Liability stated in

the Declarations, or $1,000,000. All terms and conditions of the Optional Non-Practicing Extended Reporting Period shall otherwise apply.

The Company has the right to require reasonable proof of **"Permanent Total Disability"** or death, including, but not limited to, medical records, a death certificate, and a medical examination.

C. Exercising the Options

The options set forth in SECTION IV: EXTENDED REPORTING PERIODS shall not apply if, at the end of the **"Policy Period"**, the **"Named Insured"** has not paid in full to the Company the premium for the Policy, and reimbursed the Company in full for all Deductible amounts owed to the Company. These options shall not be available if any **"Insured's"** license or right to practice his or her profession is revoked or suspended by any regulatory or disciplinary board, or voluntarily surrendered during any investigation by any regulatory or disciplinary agency or board.

The right to purchase or receive any Extended Reporting Period set forth in this SECTION IV., B. Other Extended Reporting Periods must be exercised by the **"Named Insured"**, an **"Insured"** or an **"Insured's"** representative, as applicable, by giving written notice received by the Company not later than 60 days after the **"Policy Period"** ends and such notice must be accompanied by full payment for the Extended Reporting Period, if any payment is due. Such notice must indicate the length of the Extended Reporting Period requested.

If such notice and premium, if any, for the Extended Reporting Period are not received by the Company within 60 days from the end of the **"Policy Period"**, the **"Named Insured"**, an **"Insured"** or an **"Insured's"** representative, as applicable, shall be deemed to have irrevocably waived the option to purchase or receive an Extended Reporting Period.

D. Application of Deductible during an Extended Reporting Period

If an **"Insured"** is entitled to an Optional Non-Practicing Extended Reporting Period or a Permanent Total Disability Extended Reporting Period without charge, as set forth in Paragraphs 2. and 3. of Subsection B. Other Extended Reporting Periods above, the Deductible shall not apply to any **"Claim"** covered thereunder. The Deductible amount shall apply in full to **"Claims"** covered by the Basic Extended Reporting Period and any other Optional Extended Reporting Period.

## SECTION V: EXCLUSIONS FROM COVERAGE

Notwithstanding any other provision in this Policy to the contrary, this Policy does not apply:

A. To any **"Claim"** arising out of any illegal, dishonest, fraudulent, criminal, deliberate or malicious act or omission committed by any **"Insured"**. The Company will defend a civil **"Claim"** alleging such conduct, provided that in the event a final judgment or adjudication

establishes such conduct by any "**Insured**", the Company shall have the right to be reimbursed by the "**Insureds**" and the "**Named Insured**", jointly and severally, for any "**Claim Expenses**" paid to defend such "**Claim**". In no event will the Company have any liability under this Policy to pay on behalf of any "**Insured**" any "**Damages**" arising from such "**Claim**", or to defend any criminal or disciplinary action or proceeding arising from such "**Claim**".

B.  To any "**Claim**" arising out of any act or omission in the performance of, or failure to perform, "**Professional Services**" for any "**Business Enterprise**": 1) which is or was owned, controlled, operated or managed by any "**Insured**", or by any "**Insured's**" family members, in any capacity, including the ownership, maintenance or use of any property; or 2) in which any "**Insured**" or his or her family members have, or ever had, singly or collectively, more than a 5% equity interest

C.  To any "**Claim**" arising out of any "**Insured's**" services and/or capacity as:

    1.  an officer, director, partner, stockholder, owner, trustee or employee of a "**Business Enterprise**" or a pension, a welfare or a profit-sharing plan, or any mutual or investment fund or trust; or

    2.  a public official or an employee of a governmental or quasi-governmental body, subdivision, or agency, unless the "**Insured**" is deemed to be a public official or an employee of such entity solely by virtue of rendering "**Professional Services**" to it as an outside counsel.

    3.  a fiduciary under the Employee Retirement Income Security Act of 1974 and its amendments or any regulation or order issued pursuant thereto, except if an "**Insured**" is deemed to be a fiduciary solely by reason of "**Professional Services**" rendered with respect to an employee benefit plan.

D.  To any "**Claim**" arising out of bodily injury, mental anguish, emotional distress, mental illness, humiliation, sickness, disease or death of any person, or physical or mental injury to or destruction of any tangible property, including all loss of use of that property, or loss of use of tangible property that is not physically injured, except that this exclusion shall not apply to mental illness, or mental or emotional distress, or humiliation caused by "**Personal Injury**".

E.  To any "**Claim**" arising out of a notarized certification or acknowledgment by any "**Insured**" of a signature that was made without the person who is, or claims to be, the one signing the document being physically present.

F.  To any "**Claim**" made by any past, present or prospective "**Insured**" against any "**Insured**", unless such "**Claim**" results from the performance of or failure to perform

"Professional Services" by the "Insured" in an attorney-client relationship with the claimant.

G. To any "Claim" arising out of discrimination by any "Insured" on the basis of race, creed, national origin, gender, age, marital status, height, weight, disability, or sexual preference, other than in the performance of, or failure to perform, "Professional Services" in an actual or prospective attorney-client relationship with the claimant.

H. To any "Claim" arising out of conspiracy, aiding and abetting, intentional breach of contract, intentional interference with rights or obligations, assault, battery, trespass or violations of the provisions of the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. Sections 1961, et seq.

I. To any "Claim" arising out of, in whole or in part, any "Securities Work" of the "Insured". However, this exclusion shall not apply to legal representation of parties in litigation or arbitration of any matter involving securities.

J. To any "Claim" arising out of the "Named Insured's" or a "Predecessor Firm(s)'" or a "Scheduled Title Agency's" sharing of office space, premises, facilities, equipment, supplies, or employees and/or expenses with any other law firm or legal practice, including, but not limited to, the following:

   1. any "Claim" arising out of an allegation that the "Insured" or any other person(s) held themselves out to the claimant or the public, in any manner, to be in a partnership relationship, employer-employee relationship or other relationship with the "Insured" and which makes the "Insured" vicariously or derivatively liable for an act or omission of such other person(s) when, in fact, no such relationship existed at the time the act or omission occurred; or

   2. any "Claim" arising out of the theory of partnership by estoppel, employer-employee relationship by estoppel, apparent partnership, apparent employer-employee relationship, de facto employer-employee relationship and/or any similar theory; or

   3. any "Claim" arising out of actual or alleged, express or implied confusion or misrepresentation created by the sharing of office space, premises, facilities, equipment, supplies, or employees and/or expenses, or created by the sharing of common letterhead and/or door logos and/or by any other circumstance which might confuse or mislead the claimant or the public at large.

K. To any "Claim" for bodily injury or property damage which would not have occurred, in whole or in part, but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "Pollutants" at any time.

L. To any "Claim" arising out of any (a) request, demand or order that the "Insured" or others test for, monitor, clean-up, remove, contain, treat, detoxify or neutralize, or in any way

respond to, or assess the effects of **"Pollutants"**; or (b) **"Claim"** or suit by or on behalf of a governmental authority for **"Damages"** because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, **"Pollutants"**.

M. To any **"Claim"** arising out of any indemnity or hold harmless agreement entered into by any **"Insured"**.

N. To any **"Claim"** arising out of the rendering, or failure to render, investment advice or the performance, or failure to perform, investment services, including the sale, purchase or retaining of any investments, or any advice as to the sale, purchase or retaining of any investments.

O. To any **"Claim"** arising out of defects in title disclosed in public records and of which an **"Insured"** had actual knowledge at the date of issuance of any title insurance policy by any **"Insured"**.

P. To any **"Claim"** for liability assumed by an **"Insured"** under any oral or written contract or agreement whereby an **"Insured"** has agreed to participate in the payment of a loss, including attorney's fees, court costs and expenses, unless such liability would exist even in the absence of the contract.

Q. To any **"Claim"** based upon or arising out of an intentional breach of underwriting authority by an **"Insured"** in his or her capacity as agent for a title insurance company.

R. To any **"Claim"** based upon or arising of out of the **"Insureds"** prosecution of or failure to prosecute any patent, or the infringement of any patent by anyone, including any litigation arising out of any patent.

S. To any **"Claim"** based upon or arising out of litigation by the **"Insured"** of any intellectual property matter, including, but not limited to, any matter involving copyright, trademark, certification mark, collective mark, trade name, trade dress, service mark, or trade secrets.

T. To any **"Claim"** based upon or arising, directly or indirectly, out of war, whether or not a declared war, civil war, insurrection, rebellion or revolution, or any act or condition incidental to any of the foregoing.

## SECTION VI: CONDITIONS

### A. <u>Waiver of Exclusion and Breach of Conditions</u>

Whenever coverage under this Policy would be excluded, suspended or lost:

1. because of Exclusion A. relating to any **"Claim"** based upon or arising out of any dishonest, deliberately fraudulent, criminal, malicious or deliberately wrongful acts or omissions by any **"Insured"**; or

2. because of noncompliance with Paragraph F. of this Section or SECTION III., D. Discovery Clause relating to the giving of notice to the Company with respect to which any other **"Insured"** shall be in default solely because of the default or concealment of such default by one or more **"Insureds"** responsible for the loss or damage otherwise insured hereunder

the Company agrees that such insurance as would otherwise be provided under this Policy shall apply with respect to each and every **"Insured"** who did not personally commit, or personally participate in committing, one or more of the acts or omissions described in Exclusion A., Paragraph D. Discovery Clause, or Paragraph F. Notice of **"Claims"**, provided that if the condition be one with which such **"Insured"** can comply after receiving knowledge thereof, the **"Insured"** entitled to the benefit of the Waiver of Exclusions and Breach of Conditions shall comply with such condition promptly after obtaining knowledge of the failure of any other **"Insured"** to comply therewith. This waiver does not apply to the requirement in the Insuring Agreement that the **"Claim"** must be reported to the Company during the **"Policy Period"** or Extended Reporting Period in which the **"Claim"** was first made against any **"Insured"**.

The Company's obligation to pay in the event of such Waiver shall only be in excess of the Deductible and in excess of the full extent of any assets in the firm of any **"Insured"** who is not a beneficiary to the Waiver, whether those assets are liquidated or not.

B. Territory

The insurance provided applies worldwide, provided that the suit or arbitration proceedings are brought against the **"Insured"** within the United States of America, its territories or possessions, or Canada.

C. Limits of Liability

1. Limit of Liability - Each "Claim"

The liability of the Company for each **"Insured"** first made against the **"Insured"** during the **"Policy Period"** or any Extended Reporting Period and reported in writing to the Company during the **"Policy Period"**, or any Extended Reporting Period, shall not exceed the amount stated in the Declarations for "Each 'Claim'".

2. Limit of Liability/Aggregate

Subject to Paragraph 1. Limit of Liability , the liability of the Company shall not exceed the amount stated in the Declarations as "Aggregate" for all **"Claims"** first made against

all "Insureds" and reported in writing to the Company during the "Policy Period" or any Extended Reporting Period, except as provided in SECTION IV., B. 3. Permanent Total Disability Extended Reporting Period.

3. Effect of Exhaustion of Limits of Liability

The Company shall not be obligated to investigate, defend, pay a judgment or settle a "Claim" after the Company's applicable Limit of Liability has been exhausted by payment of "Damages" or "Claim Expenses", or any combination thereof, or pursuant to Section III., B. Consent to Settle after the "Named Insured" has refused to consent to a settlement acceptable to the Company and the claimant. In such event, the Company shall have the right to withdraw from the further investigation or defense of such "Claim" by tendering control of said investigation, defense or settlement of the "Claim" to the "Insured". The "Insured" agrees to pay, on a going forward basis, the counsel who was originally hired and paid by the Company or cooperate in the withdrawal of counsel hired and paid by the Company.

D. Deductible

The amount stated in the Declarations as the Deductible "Each 'Claim'" applies to each "Claim", and the amount stated in the Declarations as the "Aggregate" Deductible applies to all "Claims" that are first made against any "Insured" during the "Policy Period" or an Extended Reporting Period, and reported to the Company in writing during the "Policy Period" or an Extended Reporting Period, except as otherwise stated in SECTION IV, D. Application of Deductible During an Extended Reporting Period. Such amounts shall, upon written demand by the Company, be paid by the "Insureds" and the "Named Insured", jointly and severally, within 30 days, and the Deductible shall apply to "Damages" and "Claims Expenses". The Company may direct the "Insured" to make partial or full payment of the Deductible to others.

The determination of the Company, at its sole discretion, as to the reasonableness of "Claim Expenses" shall be binding on all "Insureds".

If a "Claim" is resolved through Formal Mediation, the Deductible paid will be reimbursed up to fifty percent (50%), but not to exceed a maximum reimbursement of $7,500.

Whenever used in this Policy, the term "Formal Mediation" means that process by which a professional mediator, chosen by the parties to the "Claim" with the prior approval of the Company, or ordered by the court, meets with and intercedes between the parties to attempt to resolve the "Claim". Litigation and arbitration are specifically excluded from this definition.

E. Multiple "Insureds", "Claims" and Claimants

The inclusion herein of more than one "Insured", or the making of "Claims" or the bringing of suits by more than one person or organization, shall not operate to increase the Company's Limit of Liability. Two or more "Claims" arising out of a single act or omission or out of any "Related acts or omissions" shall be treated as a single "Claim". All such "Claims", whenever made against any "Insured", shall be deemed first made against the "Insured" at the time the earliest "Claim" arising out of such act or omission or "Related acts or omissions" was first made against any "Insured", and all such "Claims" shall be subject to the "Each 'Claim'" limit of liability and deductible as applies to that earliest "Claim".

F. Notice of "Claims"

As a condition precedent to the right to coverage under this policy, the "Insureds" and the "Named Insured" must, as soon as practicable, give written notice to the Company of any "Claim" made against any "Insured" and must tender the "Claim" to the Company for defense, but in no case shall such notice and tender occur after the expiration of the "Policy Period", or the Extended Reporting Period, during which the "Claim" was first made against any "Insured".

In the event suit is brought against any "Insured", the "Insured" and the "Named Insured" shall also immediately forward to the Company or the Company's representative, every demand, notice, summons or other process received directly by any "Insured" or by any "Insured's" representatives.

G. Assistance and Cooperation of the "Insured"

All "Insureds" shall cooperate with the Company's investigation of coverage under this policy and/or the defense of "Claims". All "Insureds" shall, upon the Company's request, submit all documents requested by the Company and submit to an examination and interrogation by a representative of the Company, under oath, if required, and shall attend hearings, depositions and trials and shall assist in effecting settlement, securing and giving evidence, obtaining the attendance of witnesses, and in the conduct of suits, as well as in the giving of a written statement or statements to the Company's representatives and meeting with such representatives, all without charge to the Company, except as otherwise provided in SECTION III., C. Loss of Earnings Allowance. The "Insured" shall further do whatever is necessary to preserve, secure and effect any rights of indemnity, contribution, subrogation or apportionment which the "Insured" may have against others and cooperate with the Company as to pursuing those rights. The "Insured" shall not exercise the "Insured's" right to either reject or demand the arbitration of any "Claim" made against the "Insured" except in accordance with the written instructions of the Company. The "Insured" shall not, except at the "Insured's" own cost, make any payment, admit any liability, settle any "Claims", assume any obligation or incur any expense without the written consent of the Company.

**H.** Subrogation

In the event of any payment under this Policy, the Company shall be subrogated to all the "Insured's" rights of recovery therefor against any person or organization and the "Insured" shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The "Insured" shall take all steps necessary to preserve and protect, and shall do nothing to prejudice such rights.

The Company shall not exercise any such rights against any persons, firms or corporations included in the definition of "Insured". Notwithstanding the foregoing, however, the Company reserves the right to exercise any rights of subrogation against an "Insured" in respect of any "Claim" arising out of any intentional, dishonest, deliberate, fraudulent, criminal or malicious act or omission of any "Insured".

Any subrogation amount recovered shall be apportioned as follows:

Any recovery shall: first be used for the repayment of expenses incurred toward subrogation; second, to any "Damages" or "Claims Expenses" paid by the "Insured" in excess of any Deductible(s); third, to any payments made by an excess carrier on behalf of the "Insured"; fourth, to any "Damages" or "Claims Expenses" or "Loss of Earnings" paid by the Company; fifth, to any loss and expense payments by any other primary carrier on behalf of the "Insured"; and last, to repayment of the "Insured's" Deductible.

**I.** Action Against the Company

No action shall lie against the Company unless, as a condition precedent thereto, the "Insured" shall have fully complied with all the terms of this Policy, nor until the amount of the "Insured's" obligation to pay shall have been fully and finally determined either by judgment against the "Insured" after actual trial and appeal, if any, or by written agreement of the "Insured", the claimant and the Company.

Nothing contained in this Policy shall give any person or organization the right to join the Company as a co-defendant in any action against the "Insured" to determine the "Insured's" liability. Bankruptcy or insolvency of the "Insured" or of the "Insured's" estate shall not relieve the Company of any of its obligations hereunder.

**J.** False or Fraudulent "Claims"

If any "Insured" shall commit fraud in connection with any "Claim" submitted to the Company under this Policy, this Policy shall be void as to such "Insured" from the date such fraudulent "Claim" is submitted. In such event, the Company shall have no obligation to return any portion of the premium.

**K. Application**

By acceptance of this Policy, the **"Insureds"** agree that: 1) the statements in the application and in all additional materials submitted by any **"Insured"** for this Policy or for any prior Policies issued by this Company, which are made a part of this Policy, are personal representations, that they shall be deemed material and that this Policy is issued in reliance upon the truth of such representations; 2) this Policy embodies all agreements existing between the **"Insureds"** and the Company, or any of its agents, relating to this insurance; and 3) the **"Insureds"** have a continuing obligation to report any changes to its answers to the application questions, or in information contained in any additional submissions, including, but not limited to, any **"Claims"**, potential claims, and any changes in its areas of practice, outside ownership interests, and the number of attorneys who are partners, principals, or employees of the **"Named Insured"**.

**L. Other Insurance**

Subject to the limitations on coverage contained in SECTION I., A. Professional Liability **"Claims"** Made and Reported Insuring Clause, and SECTION IV: EXTENDED REPORTING PERIODS, and contained in any Endorsements to this Policy, this insurance shall be excess of the amount of the applicable Deductible of this Policy and any other valid and collectible insurance available to any **"Insured"**, whether such other insurance is stated to be primary, pro rata, contributory, excess, contingent or otherwise, unless such other insurance is written only as a specific excess insurance over the Limits of Liability provided in this Policy.

If two or more policies of insurance issued by the Company apply to the same **"Claim"**, the Company shall not be liable under this Policy for a greater proportion of the **"Damages"** and **"Claim Expenses"** than the Company's liability under this Policy bears to the total liability of the Company under all applicable and valid policies issued by the Company, provided that in no event shall the Company pay on behalf of all **"Insured's"** any sum that exceeds the limit of liability of the policy issued by the Company and applicable to the **"Claim"** with the highest limit of liability. The Deductibles under all applicable policies will apply to the **"Claim"**.

**M. No Waiver of Policy Provisions Except by Endorsement**

Notice to any agent or knowledge possessed by any agent or other person acting on behalf of the Company shall not effect a waiver or a change in any part of this Policy or estop the Company from asserting any right under the terms of the Policy, nor shall the terms of this Policy be waived or changed, except by endorsement issued to form a part of this Policy.

**N. Assignment**

Assignment or transfer of any interest under this Policy shall not bind the Company unless its consent is endorsed hereon.

O.  **Cancellation**

This Policy may be canceled by the **"Named Insured"** by surrender thereof to the Company or by mailing written notice to the Company stating when thereafter such cancellation shall be effective. If canceled by the **"Insured"**, the Company shall retain the customary short rate proportion of the premium.

This Policy may be canceled by the Company by mailing to the **"Named Insured"** listed in the Declarations written notice stating when, not less than 30 days thereafter, such cancellation shall be effective. Such notice shall be binding on all **"Insureds"**. However, if the Company cancels the Policy because the **"Named Insured"** has failed to pay a premium or Deductible when due, this Policy may be canceled by the Company by mailing a written notice of cancellation to the **"Named Insured"** stating when, not less than 10 days, or such shorter period allowed by law thereafter, such cancellation shall be effective. The mailing of notice shall be sufficient notice and the effective date of cancellation stated in any notice shall become the end of the **"Policy Period"**. Hand delivery of such written notice by the **"Named Insured"** or the Company shall be the equivalent to mailing. If any provisions in this paragraph are different than those required or allowed by law, the provisions of law will govern.

If canceled by the Company, earned premium shall be computed pro rata. Premium adjustment may be made at the time cancellation is effected or as soon as practicable thereafter.

IN WITNESS WHEREOF, the Company has caused this Policy to be executed and attested, but this Policy shall not be valid unless countersigned on the Declarations page by a duly authorized representative of the Company.

**Medmarc Casualty Insurance Company**

_____

**SECRETARY**

_____

**PRESIDENT**

PLP-1001  Rev. 12/03

**Medmarc Casualty Insurance Company**

3022 LPL END Rev. 11/05
Page 1 of 2

### EMPLOYMENT PRACTICES LIABILITY ENDORSEMENT - BASIC LIMITS

It is hereby understood and agreed that the following is added to Section III., E. Additional Defense Coverage:

Notwithstanding the other terms, limitations and exclusions in the Policy, the Company will pay reasonable legal fees and expenses to defend an "**Insured**" against a claim or action alleging "Employment Practices Liability", as defined herein, which is first made against any "**Insured**" during the "**Policy Period**" or any Extended Reporting Period, and reported to the Company in writing during the "**Policy Period**" or any Extended Reporting Period. The Company's liability for defense under this Endorsement shall be limited as set forth below, and is separate from the Limit of Liability under SECTION VI., C. Limits of Liability. The "**Insured**" agrees that the Company has the right to investigate and defend any claim or action alleging Employment Practices Liability through counsel designated by the Company, and such defense is subject to the terms of SECTION III., A. Defense, Paragraphs 2 and 3. The Loss of Earnings Allowance set forth in SECTION III., C. Loss of Earnings above shall not apply to proceedings or hearings subject to this Subsection E. The Deductible, as stated in the Declarations, shall not apply to any "**Claim**" alleging "Employment Practices Liability".

In the event that the Company has paid the full limits as set forth herein, the "**Insured**" agrees that Company may withdraw from defending the "**Insured**" and agrees to cooperate in the transition of the case to counsel paid for by the "**Insured**" and/or the withdrawal of counsel hired and paid by the Company.

"Employment Practices Liability" as used herein shall mean only a claim or action resulting from allegations of:

(1) wrongful termination by the "**Named Insured**" of any "**Insured**" other than a partner of any kind, a shareholder, or an "of counsel" lawyer; or

(2) employment discrimination, or employment-related harassment, including sexual harassment, by the "**Named Insured**" of any "**Insured**", other than a partner of any kind, a shareholder, or an of counsel lawyer; or

(3) violation by the "**Named Insured**" of a federal, state, or local statute or ordinance providing employment benefits to an "**Insured**", other than a partner of any kind, a shareholder, or an "of counsel" lawyer, but coverage under this paragraph (3) is only with respect to the administration of a benefits program by a person authorized by the "**Named Insured**". "Administration" shall mean only the determination of eligibility to participate in such

**Medmarc Casualty Insurance Company**

programs, enrollment in such programs, record-keeping for such programs, interpreting the provisions of such programs, and giving advice as to an employees rights or interests in such programs.

The Company's liability for the defense under this Endorsement shall be limited as follows to:

    (1) $50,000, if the Policy limit shown on the Declarations Page is $1,000,000 or more for "Each 'Claim'"; or

    (2) $25,000, if the Policy limit shown on the Declarations Page is $500,000 or more for "Each 'Claim'", but less than $1,000,000 for "Each 'Claim'"; or

    (3) $10,000, if the Policy limit shown on the Declarations Page is $100,000 or more for "Each 'Claim'", but less than $500,000 for "Each 'Claim'".

In the event that a claim or action alleging "Employment Practices Liability" is made in response to a claim or action brought by any "**Insured**" against any other "**Insured**", the Company has no obligation to provide coverage pursuant to this Sub-Section.

This endorsement is part of the Policy and takes effect on the Inception Date of the Policy, unless another Effective Date is shown below.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

This endorsement is part of the Policy and takes effect on the Inception Date of the Policy, unless another Effective Date is shown below.

ENDORSEMENT NO.: 2

ISSUED TO: Law Offices of Gabrielle Alexis, P.A.

POLICY NO.: 08APFL02716

EFFECTIVE DATE: 11/24/2008

BY /s/ Irwin F. Giles
        Authorized Representative

**Medmarc Casualty Insurance Company**

3027 LPL END Rev. 11/05
Page 1 of 1

## SPECIFIC "CLAIMS" EXCLUSION ENDORSEMENT

It is hereby understood and agreed that this policy:

1) does not apply to any **"Claim"** based upon or arising out of, in whole or in part, or alleging the following act(s), error(s), ommission(s), **"Claim(s)"** incident(s):

2) does not apply to any **"Claim"** involving or relating in any way to the following person(s) or entity(ies):

   **Deguer Jean Baptiste; Cedine Jeane Jacques**

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

This endorsement is part of the Policy and takes effect on the Inception Date of the Policy, unless another Effective Date is shown below.

ENDORSEMENT NO.: 3

ISSUED TO: Law Offices of Gabrielle Alexis, P.A.

POLICY NO.: 08APFL02716

EFFECTIVE DATE: 11/24/2008

BY /s/ Irwin F. Giles
Authorized Representative

**Medmarc Casualty Insurance Company**

### FLORIDA AMENDATORY ENDORSEMENT

A.  It is hereby understood and agreed that the final paragraph of Section IV. B. 1.Optional Extended Reporting Period is deleted.

B.  It is hereby understood and agreed that Section IV B. 2. Optional Non-Practicing Extended Reporting Period is deleted and replaced as follows:

If during the **"Policy Period"** any **"Insured" "Retires"** then such **"Insured"**, upon payment of an additional premium as set forth herein, shall have the option to extend the Reporting Period, subject otherwise to its terms, Limits of Liability, exclusions and conditions, for a period of either:  (a) 12 Months, (b) 24 Months, (c) 36 Months; or (d) an unlimited duration for **"Claims"** first made against the **"Insured"** and reported in writing to the Company during the Optional Non-Practicing Extended Reporting Period arising from acts or omissions in **"Professional Services"**, or **"Personal Injury"** arising from **"Professional Services"**, during the **"Policy Period"**.  If purchased, the Optional Non-Practicing Extended Reporting Period will commence on the earlier of the date the **"Insured" "Retires"** or otherwise totally ceases the private practice of law, or the termination of the **"Insured's"** coverage under this Policy.

The additional premium for the Optional Non-Practicing Extended Reporting Period shall be a multiple of:  (a) 100% for 12 Months; (b) 150% for 24 Months; (c) 185% for 36 Months, or (d) 285% for an unlimited duration applied to the full annual premium for this Policy.

There will be no additional premium for an Optional Non-Practicing Extended Reporting Period of unlimited duration if the **"Named Insured"** has maintained coverage with the Company for at least three consecutive years.

The Optional Non-Practicing Extended Reporting Period does not extend the **"Policy Period"** or change the scope of coverage provided.  They apply only to **"Claims"** arising from acts or omissions, or **"Personal Injury"**, arising from **"Professional Services"** rendered during the **"Policy Period"**, but not before the Retroactive Date, if any, shown in the Declarations.

The Optional Non-Practicing Extended Reporting Period does not reinstate or increase the Limits of Liability.  The Optional Non-Practicing Extended Reporting Period does not apply to **"Claims"** that are covered under any other insurance, or that would be covered but for the exhaustion of the limit of liability thereunder.

The Optional Non-Practicing Extended Reporting Period does not extend the **"Policy Period"** or change the scope of coverage provided by this Policy.

**Medmarc Casualty Insurance Company**

4000 LPL END FL Rev. 03/05
Page 2 of 2

The Optional Non-Practicing Extended Reporting Period does not reinstate or increase the Limits of Liability.

C. It is hereby understood and agreed that Section VI. K. False or Fraudulent Claims is deleted and replaced as follows:

If any **"Insured"** shall commit fraud in connection with any **"Claim"** submitted to the Company under this Policy, this Policy shall be void as to such **"Insured"** from the date such fraudulent **"Claim"** is submitted.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

This endorsement is part of the Policy and takes effect on the Inception Date of the Policy, unless another Effective Date is shown below.

ENDORSEMENT NO.:  4

ISSUED TO: Law Offices of Gabrielle Alexis, P.A.

POLICY NO.: 08APFL02716

EFFECTIVE DATE: 11/24/2008

BY /s/ Irwin F. Giles
Authorized Representative

**Medmarc Casualty Insurance Company**

4001 LPL END FL Rev. 03/05
Page 1 of 2

## FLORIDA CHANGES - CANCELLATION AND NONRENEWAL

It is hereby understood and agreed that SECTION VI. O. Cancellation is deleted and replaced with the following:

### CANCELLATION

A. If this Policy has been in effect 90 days or less, the Company may cancel this Policy by mailing or delivering to the first **"Named Insured"** written notice of cancellation at least:

(1) 10 days before the effective date of cancellation if cancellation is for nonpayment of premium; or

(2) 20 days before the effective date of cancellation if cancelled for any other reason, except the Company may cancel immediately if there has been:
   (a) A material misrepresentation; or
   (b) A failure to comply with underwriting requirements

B. If this Policy has been in effect for more than 90 days, the Company may cancel this Policy only for one or more of the following reasons:

(1) nonpayment of premium;

(2) Material misrepresentation on the application;

(3) Failure to comply with underwriting requirements within 90 days of the policy's effective date;

(4) Substantial change in the risk;

(5) If the insurer is cancelling all insureds under such policies.

The Company will mail or deliver written notice of cancellation to the first **"Named Insured"** at least:

(a) 10 days before the effective date of cancellation if cancelled for nonpayment of premium; or

(b) 45 days before the effective date of cancellation if cancelled for any other reason stated in B. above.

**Medmarc Casualty Insurance Company**

4001 LPL END FL Rev. 03/05
Page 2 of 2

---

NONRENEWAL

If the Company elects not to renew this Policy, the Company will mail or deliver to the first **"Named Insured"** at the last known address a written notice of nonrenewal, accompanied by the reason for nonrenewal, at least 45 days prior to the expiration of this Policy.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

This endorsement is part of the Policy and takes effect on the Inception Date of the Policy, unless another Effective Date is shown below.

ENDORSEMENT NO.: 5                    ISSUED TO: Law Offices of Gabrielle Alexis,
                                                                P.A.

POLICY NO.: 08APFL02716              EFFECTIVE DATE: 11/24/2008


                                                    BY /s/ Irwin F. Giles
                                                          Authorized Representative